The People of the State of Illinois ex rel. John S. Rusch, Defendant in Error, v. Alex Rivlin et al., Respondents. Martha Rabinovitz and Florence Arieu, Plaintiffs in Error.

Gen. No. 37,266.

184

Opinion filed October 16, 1934.   Rehearing denied October 29, 1934.

SIMON HERR and MARTIN O. WEISBROD, for plaintiffs in error; MICHAEL A. ROMANO, of counsel.

THOMAS J. COURTNEY, State's Attorney, for defendant in error; JOHN F. CASHEN, JR., Assistant Attorney to Board of Election Commissioners, of counsel.

MR. JUSTICE SCANLAN delivered the opinion of the court.

There was filed, in the county court of Cook county, by John S. Rusch, chief clerk of the board of election commissioners of the city of Chicago, a petition against William Kohen, Alex Rivlin, Lina W. Singer, Martha Rabinovitz and Florence Arieu, which recites that on November 8, 1932, a general election was held in the city of Chicago at which various candidates of different political parties were voted upon; that respondents served as judges and clerks of election at that election in the 41st precinct of the 24th ward; that certain misconduct and misbehavior of respondents as judges and clerks of election at said election "constitutes . . . contempt or contempts" of said court; that respondents, while so serving, fraudulently and unlawfully made a false canvass, tally, proclamation and return of the votes so cast in said precinct and were guilty of corrupt and fraudulent conduct and practice in their duties as judges and clerks of said election.  The petition further avers that at said election there were 24 candidates for the office of associate judge of the municipal court of Chicago, of which num-

ber 12 were to be elected. The petition then sets forth, in detail, the canvass, tally and return made by the judges and clerks as to each individual candidate for said office, and the actual number of votes received by each of the candidates. The petition further avers "that the discrepancies between the returns of the respondents herein and the actual vote cast for each of the candidates for Associate Judge of the Municipal Court of Chicago was caused by and through the fraudulent, corrupt and unlawful acts of said respondents herein." The petition prays that a rule be entered upon respondents to show cause why they should not be held in contempt of court, and such a rule was entered. Respondents Kohen and Rivlin were fugitives from justice at the time of the hearing of this cause, September 19, 1933. A motion of respondent Singer and plaintiffs in error, Rabinovitz and Arieu, to quash the petition was overruled and thereupon they entered "pleas of not guilty." The record further shows that said respondent and plaintiffs in error orally answered the rule to show cause. On hearing of evidence in open court respondent Singer and plaintiffs in error were all found guilty of contempt of court by the trial court, and respondent Singer was sentenced to the county jail for the term of 60 days, plaintiff in error Arieu for the term of 30 days, and plaintiff in error Rabinovitz for the term of 15 days. Plaintiffs in error, Rabinovitz and Arieu, sued out this writ of error in this court (No. 37,266) and respondent Singer thereafter sued out a like writ (No. 37,271). Upon order entered the latter case was consolidated for hearing in this court with the instant one.

Upon the hearing it was shown that after the election in question there was an election contest case entitled *Heller v. Hasten*, conducted before Judge Mangan, which involved a recount of the ballots cast in the precinct in question for associate judges of the municipal court of Chicago. The figures shown by the recount, the tally sheets returned by the judges

and clerks of election in said precinct, also the poll books, were admitted in evidence by stipulation. It was further stipulated that the official returns made by the said judges and clerks of election for the candidates for associate judge of the municipal court of Chicago, and the actual votes received by said candidates, as shown by the recount made before Judge Mangan, were as follows:

| Candidates | Official returns made by judges and clerks of election. | Actual votes received as shown by recount. |
|---|---|---|
| Rooney | 586 | 426 |
| Dunne | 578 | 422 |
| Bicek | 576 | 383 |
| McGarry | 574 | 403 |
| Hayes | 547 | 407 |
| Kasper | 523 | 410 |
| Bonelli | 594 | 414 |
| Urbanski | 556 | 395 |
| Holland | 580 | 393 |
| Gutknecht | 588 | 411 |
| Smith | 568 | 394 |
| Hasten | 568 | 386 |
| Trude | 49 | 135 |
| Casey | 59 | 115 |
| Heller | 59 | 207 |
| Sbarbaro | 150 | 137 |
| Holmes | 49 | 94 |
| Eberhardt | 49 | 98 |
| Fairbanks | 49 | 105 |
| McMillan | 49 | 90 |
| Schulman | 174 | 180 |
| Fetzer | 59 | 101 |
| Fisher | 149 | 145 |
| Haas | 49 | 102 |

The official returns made by the judges and clerks show 478 straight Democratic and 49 straight Republican votes cast; while the recount shows 355 straight Democratic votes cast and 71 straight Republican votes cast, 160 split ballots cast, 46 blank ballots (initialed), 6 spoiled ballots, 4 blank ballots (not initialed), and 4 ballots ''held'' by Judge Mangan. It was further stipulated that the following judges and clerks of election served in the precinct in question: ''Republican Judge: William Kohen; Democratic Judge: Alex Rivilin; Republican Judge: Lena W. Singer; Republican Clerk: Martha Rabinovitz; Democratic Clerk: Florence Arieu.''

Angela DeVere, a watcher for the Republican party, testified, for the petitioner, in substance as follows: That on November 8, 1932, she was in the said polling place, as a watcher, from about 5:50 a. m. until midnight, at which last mentioned time the ballot boxes had been sealed; that at 5 p. m. the polling place was closed, the ballot boxes were then opened, and the ballots dumped upon the table; that from that time until about 10 o'clock nothing was done about counting the ballots; that after the ballot boxes were opened respondents Kohen and Rivlin and Democratic precinct captains Kuntarski and Brownstein went into the room back of the polling place and remained there for several hours; that they then came back to the polling place; that ''they had a lot of figures on a piece of paper and they told the judges and clerks to get busy with their tally sheets and tally them up. . . . Q. When they directed the two clerks and the judge to make entries upon their tally sheets, what did the two judges and clerks do, if anything? A. They just got out their tally sheets and they told them how many straights, and there was a little confusion, somebody wanted a few more votes than the others. They said 'All right, how many do you want? We will give them

to you.' And they totaled them up, so many splits—'';
that the clerks then made entries on the tally sheets
as directed; "The Court: What do you mean? A.
Mr. Kohen and the barber, Mr. Rivilin, and the pre-
cinct captains and their workers, came out and told
them 'Now, get busy with your tally sheets so we get
through; put down so many straights for the Repub-
licans and so many for the Democrats.' Somebody
made a remark about the Communist and Socialist.
They said 'Well forget about that, we will not count
them.' The Court: Who was saying this? A. Brown-
stein and Kuntarsky, and there was some fellow who
was cross-eyed, I don't know their names, and so then
they just tallied up, and that was all there was to it.
Mr. Cashen (counsel for petitioner): Q. Mrs. DeVere,
where were the ballots, if you know, during the time
that Alex Rivilin, as you describe him or call the
barber, and William Kohen and these two precinct
captains were in the back room? A. They were on
the table. Q. Anybody guarding the ballots at that
time? A. Well, the judge and these two clerks here,
they sat at the table at all times. Q. At any time were
those ballots in the box, either the Presidential ballots,
the Judicial ballots, counted by any judges in the
presence of the clerks? A. They were not counted at
any time, no ballots, the same as the Judges ballots;
all figures.'' Upon cross-examination the following
occurred: "The Court: Did he have a paper in
his hand? A. Yes, they came out with a piece of paper
about the size of that blotter there (indicating), about
this long. The Court: Who had the paper? A.
Brownstein and Rivilin, they compared them, they
changed some figures. . . . Q. (by Mr. Romano,
counsel for respondent Singer) And Mrs. Singer acted
on what was told her by Rivilin and Kohen? A. They
all did, all the judges and clerks. Q. What time was
that, Mrs. DeVere, when Kohen and Rivilin gave their
totals to the clerks? A. That about be about half

past ten, because they had this recess to see what they were going to do with these ballots.'' The witness further testified that after the boxes were first opened Rivilin, Brownstein and Kuntarsky ''ran the precinct as they pleased,'' and ''the rest of them stepped back and waited for orders''; that a bystander, Maurie Gruffman, told plaintiff in error Rabinovitz that she was too slow in the tallying and he then took the latter's tally sheet and made figures upon it; that about 10 o'clock the Republican watcher, one Price, and his wife, were ejected from the polling place.

Petitioner then closed his case and plaintiffs in error and respondent Singer moved that the petition be dismissed as to all of them. Mr. Herr, counsel for plaintiff in error Arieu, in connection with the motion, made the following statement to the court: ''It is our position that Mrs. DeVere has accurately stated what transpired in that polling place. The Court: Why do you say that? Mr. Herr: Why? There is no reason why a lady like Mrs. DeVere should be disputed too. What she described aptly described it accurately. These young ladies who were clerks virtually —two, the one judge was virtually put into a position of a clerk, that is Mrs. Singer,—were under the domination and control of two judges, who, under the law, have a majority control, and a majority rules in a precinct. These same respondents have all, in another case, appeared in Court and testified in another branch of this same Court, your Honor, as to what transpired there *and endorsed what Mrs. DeVere now says*. . . . They have been ready to cooperate with the prosecution in bringing to justice the real culprits.'' The court then stated that it seemed ''very clear'' to him from the evidence introduced by petitioner that ''an atrocious'' fraud had been ''put over in this precinct,'' and that plaintiffs in error and respondent Singer must have known that ''a gigantic fraud was being put over'' and acquiesced in the same. The court called

attention to the fact that counsel for plaintiffs in error and respondent Singer had conceded that the testimony of Mrs. DeVere was true. Counsel for plaintiffs in error and respondent Singer then stated a number of times that they wished to cooperate with the county court in the prosecution of the ''real culprits'' and that their clients' testimony would accord with that of Mrs. DeVere, but that they felt that before they placed their clients on the stand in the contempt proceedings they should be assured that their clients would not thereafter be prosecuted for a felony arising out of the alleged acts. Mr. Cashen (representing the petitioner) refused to give any such assurance and stated that finding the respondents in the contempt proceedings guilty of contempt would not bar criminal prosecution for the acts in question. The trial court stated that he could not guarantee immunity from criminal prosecution. After a number of delays plaintiffs in error and respondent Singer were finally called as witnesses by their counsel. Plaintiff in error Rabinovitz testified that the ballot boxes were opened at 5 p. m. and the ballots dumped upon the table but that the ballots were never separated; that between that time and 10:30 nothing was done in the way of counting the ballots; that after the ballots had been dumped upon the table respondents Rivlin and Kohen, and Brownstein and Gruffman went into the back room and remained there until about 9 o'clock, when they came back into the polling place with a piece of paper and some figures on it and ''made the announcement'' and Rivlin gave the clerks the totals for the candidates and the clerks tallied the same; the clerks ''tallied as many tallies as would make his total''; that they told the clerks what to do; ''he gave us figures for a certain candidate, and then he told us to tally as many totals as he gave us''; that she did not remember them counting any ballots; that before Rivlin gave them the totals Hyman Price, the Republican watcher, and his wife,

were "thrown out" of the polling place by Rivlin and Brownstein; that during the time the announcement of the votes was being made Maurie Gruffman "grabbed the tally sheet away from me," and made the tallies upon her sheet, and that the figures shown upon her sheet were not made by her; that no one called off names from the ballots "one at a time"; "I didn't see any ballots counted"; that during the entire time that Rivlin and the others were in the back room the ballots remained upon the table in the polling place. The following question was then put to the witness by Mr. Romano: "Q. Do you mean while these men were eating in the back room that the ballots spread on the table in the front part of this building, then they came out with a piece of paper with some figures on it? A. I think it is a fact." Respondent Singer testified that nothing was done about counting the ballots until 10 p. m. or later; that Rivlin then started counting the ballots and Brownstein said: "Rivilin, the way you are going we will be here all night and all day tomorrow; let's get through with this count; count them the way you always counted"; that Rivlin "had the ballots, he was thumbing them and putting down totals on a piece of paper, and Brownstein was standing next to him; there was a piece of paper between them. Mr. Rivilin was writing there; I could not see what he was writing. As the girls were ready, he would call a total and fill it in. . . . Q. Do you know whether he counted them? A. He gave every appearance of counting them, as far as I could see. . . . I didn't honestly know he was counting them, I was on the opposite side of the table. . . . Q. Was he actually taking the ballot and turning it over and then taking another one? A. No, sir." Rivlin told us he counted the judicial ballots. "Q. Did you see him count them? A. Only as I stated, he had them in front of him, and he was turning them over and put the figures on a piece of paper, and he gave

the totals to the clerks. Q. So, in other words, they put the totals down on the tally sheets first, and then put down the tally marks afterwards? A. They did, yes, sir.'' The witness further testified that the presidential ballots were divided into piles and that she watched Rivlin calling off the ballots as to that office; that when Rivlin gave the clerks the totals he had ''a piece of brown scratch paper'' and she saw him writing upon it. The witness stated that she did not know that there was a conspiracy between Kohen, Rivlin, Brownstein and Kuntarsky and that she acted as she did because she was told that the majority ruled; that for about half an hour Gruffman made entries upon the clerks' tally sheets by direction of Kohen and Rivlin; *that she went into the back room several times during the evening and ''there were fifteen or twenty people that were making trips back and forth all the time.''* Plaintiff in error Arieu testified that she understood that Rivlin was the ''supreme judge'' in the precinct and that she did not know or suspect that he was giving them false totals or that he and others had entered into an agreement to favor certain candidates and disfavor others; that Gruffman worked on her books for about five minutes; that they got the totals from Rivlin and afterwards filled in the tally marks; that for a while, when the vote for the presidential candidates was being called, the judge called the name of a candidate and the clerks entered a tally mark as he did so, but that Brownstein said to Rivlin: ''At the rate you are going now, you will never get through. . . . Why don't you do this the way you always did?'' and thereafter Rivlin turned the ballots ''and put a mark with a pencil on a piece of paper, and he would give us, the clerks, that total. . . . Mr. Rivilin would give us the grand total and we would put in individual marks until we arrived at the amount he gave us. Q. Did you hear any votes called that night on any candidate at all for President or other

candidates? A. Just at the beginning"; that when Rivilin gave them the totals to put on the tally sheets she believed that he was honestly totaling the number of votes for the candidates and doing it in a quicker way.

Plaintiffs in error and respondent Singer had served as election officials at a primary election held before the one in question, had attended Judge Jarecki's school for instructions for election officials, and had received the book of instructions given to all said officials. They made no complaint to the election commissioners nor the police as to any happenings at the polling place on the day in question, nor did they make any inquiries during that day of the election commissioners respecting their duties and rights.

At the conclusion of the evidence the various counsel for plaintiffs in error and respondent Singer made arguments to the court. In each argument it was conceded that there was a conspiracy of Rivlin and others to have a false return made of the votes cast for the judicial candidates. Counsel for Mrs. Arieu stated that "they (plaintiffs in error and respondent Singer) did not have personal initiative to assert themselves and assert their rights. All people are not combative, and when they recognize it means nothing but combativeness, they take the easier course and do not resist. That is possibly the extent of the misconduct on the part of any of the three here; they did not resist strongly enough. They were not voluble; they were not combative"; that they conceived it to be their obligation to put down what the judges told them, and that "they, being conscious that something went wrong at the polling place, it would be their duty to come in and squeal," but that if they had done so, "every day would be a day of Hell; the freedom of the streets would no longer be theirs. . . . *Mrs. DeVere's testimony was substantially correct, and she aptly described the situation there"*; but that the punishment

the attorney for petitioner had asked the court to impose upon plaintiffs in error and respondent Singer was too severe. Mr. Eller, counsel for Miss Rabinovitz, stated that "while Miss Rabinovitz was there and acquiesced, possibly by keeping quiet about certain things that were happening," she was dominated by others in the polling place and the trial court should "give consideration to Miss Rabinovitz in entering your penalty." Mr. Romano concluded his argument as follows: "I commit my client to your tender mercy and suggest this, if there ought to be punishment it ought to be by fine, and fine only, and I think society would so will it, regardless of Mr. Cashen's recommendation."

We have stated, at some length, the material evidence and the position taken by counsel for plaintiffs in error and respondent Singer in the trial court, for the reason that it is contended in this court that "the finding and judgment of the court is contrary to the weight of the evidence," and it is argued, in support of this contention, that the evidence must prove the parties guilty beyond a reasonable doubt and that petitioner has failed to successfully carry this burden, and we are asked to reverse the judgment on the ground that the proof fails to prove the guilt of plaintiffs in error and respondent Singer.

Section 13, ¶ 267, ch. 46, Cahill's Ill. Rev. St. 1933, provides in part:

"Upon the confirmation of such judges and clerks, at any time, a commission shall issue to each of such judges and clerks, under the seal of such court, and appropriate forms shall be prepared by said board of commissioners for such purpose. And after confirmation and acceptance of such commission, such judges and clerks shall thereupon become officers of such court and shall be liable in a proceeding for contempt for any misbehavior in their office, to be tried in open court on oral testimony in a summary way, without

formal pleadings, but such trial or punishment for contempt of court shall not be any bar to any proceedings against such officers, criminally, for any violation of this act.''

'' 'That the legislature intended to abolish the common-law rule in this class of contempts can hardly be doubted from the language of the statute which expressly provides for a trial ''in open court on oral testimony in a summary manner without formal pleadings.'' ' (*People v. Sylvester,* 242 Ill. App. 565, 571–2, and cases therein cited.) . . . The distinction between a contempt and a criminal offense is clearly pointed out in the case of *People v. Panchire,* 311 Ill. 622. The instant contempt charge is a purely statutory proceeding. When the plaintiff in error became a judge of election he thereby became an officer of the county court, and the power to punish for contempt an election official for misbehavior in office is vested in the county court by section 13.'' (*People ex rel. Rusch v. Johnson,* 255 Ill. App. 288, 291–2. See also *People v. White,* 334 Ill. 465, where the section in question and its purposes are passed upon.)

''While contempts are generally spoken of as offenses, yet by the greater weight of authority and better reasoning they are in reality *sui generis,*—they are *quasi* crimes or offenses.'' (*People v. Panchire,* 311 Ill. 622, 629.)

While we think that petitioner was not required to prove the guilt of plaintiffs in error and respondent Singer beyond a reasonable doubt, nevertheless, if such principle of law is applicable in the instant case we are satisfied that petitioner successfully bore the burden imposed by that rule. Counsel for the parties claim that Rivlin and Brownstein formulated their conspiracy in the back room and that as the evidence shows that plaintiffs in error and respondent Singer remained in the polling place they could not have been parties to the conspiracy. Respondent Singer testified

that she was in the back room on several occasions during the evening. However, it was not necessary for petitioner to prove that plaintiffs in error and respondent Singer met with Rivlin and the others during the evening, as the law is settled that it is not necessary to prove that alleged conspirators came together and actually agreed, in terms, upon a common design and to pursue it by common means. It is sufficient if it be proved by facts and circumstances that they pursued, by their acts, the same object, one performing one part, another performing another part of the same, so as to complete it with a view to the attainment of that same object, for under such a state of facts the conclusion would be justified that they were engaged in a conspiracy to effect that object. Nor is it necessary to prove that alleged conspirators met during the process of the concoction of the conspiracy, for every person entering into a conspiracy or common design, already formed, is deemed in law a party to all acts done by any of the other parties, before or afterwards, in furtherance of the common design.

It is strenuously contended that ''the plaintiffs in error (and respondent Singer) were subdued and dominated in the performance of their duty by the men in the polling place.''

''The compulsion which will excuse a criminal act, however, must be present, imminent, and impending, and of such a nature as to induce a well grounded apprehension of death or serious bodily harm if the act is not done. A threat of future injury is not enough. Such compulsion must have arisen without the negligence or fault of the person who insists upon it as a defense.'' (16 C. J. 91.)

'' 'We can conceive of cases in which an act, criminal in its nature, may be committed by one under such circumstances of coercion as to free him from criminality. The impending danger, however, should be

present, imminent and impending, and not to be avoided. . . . The social system would be subverted and there would be no protection for persons or property if the fear of man, needlessly and cravenly entertained, should be held to justify or excuse breaches of the criminal laws.' *Bain v. State,* 67 Miss. 557, 560, 7 S. 408.'' (Ib.)

There are respectable authorities that hold that duress is no defense to a crime unless the impending penalty for a refusal to commit it is death. (See Am. & Eng. Ency. of Law, Vol. 10, 2d ed., pp. 346–7, and cases there cited.) Even ''the command of a military officer to a subordinate will not excuse the latter for the performance of a criminal act.'' (Id. p. 347.) There is nothing in the evidence to warrant the instant claim of compulsion or duress. Plaintiffs in error and respondent Singer went to the office of the election commissioners when they left the polling place that evening and there is no contention that they made any complaints at that office of the happenings at the polling place during the day. If they had been coerced or dominated, as they now claim, why did they not make that fact known to the election commissioners?

Plaintiffs in error and respondent Singer boldly contend that even if they knew that the ballots had not been counted, they should be held not guilty, because they were then ''under the impression that the decision of two of the three judges, Rivlin and Kohen, was absolutely controlling.'' Such a contention, under the facts, requires no answer.

Plaintiffs in error and respondent Singer contend that ''the sentences of imprisonment were based upon illogical and arbitrary considerations by the court, and the penalties were unreasonable and excessive.'' In *People ex rel. Rusch v. Johnson, supra,* we said (p. 294):

''The plaintiff in error was appointed by the county court to the honorable and important office of a judge

of election. His plain duty, under his oath of office, was to guard the ballot box, but he betrayed the trust reposed in him and aided and abetted a conspiracy that had for one of its objects the placing of illegal ballots in the box. The record discloses that the conspirators did not hesitate to use violence in the furtherance of their objects. Such a conspiracy is in its nature treasonable, for it strikes at the very life of the Republic.''

In *People v. White, supra,* p. 482, our Supreme Court said:

''The honest conduct of elections is of most vital concern to representative government.''

It would be difficult to imagine a more flagrant, brazen conspiracy to defeat the will of the people than is here shown by the evidence. That the ballots cast by the voters were never counted is not seriously disputed, and that Rivlin and others were engaged in a conspiracy to have a false return of the votes made by the precinct election officials was conceded by counsel for all of the parties during the trial. *In a presidential election,* after the ballot box had been opened and the ballots placed upon the table, nothing was done towards counting the ballots until 10 p. m. or later, and during the long wait plaintiffs in error and respondent Singer made no complaint to nor inquiries of the election commissioners. It was practically conceded that from 5 p. m. until 10 p. m., or even later, Rivlin and others were in the back room determining what votes the various candidates should receive. When Rivlin and Brownstein returned to the polling place, plaintiffs in error, although they knew there had been no count made of the votes cast, at once obeyed the orders of Rivlin and Brownstein and entered upon the official return sheet tallies for the various candidates that they well knew were false and fraudulent. Respondent Singer, a judge of election, stood by and permitted the consummation of the conspiracy, which could not have been accomplished without her aid and that of

plaintiffs in error. From the record we learn that many contempt proceedings of a like nature to the instant one have been lately commenced against precinct election officials, and we feel impelled to say that this nation cannot long endure, as the fathers planned it, if frauds such as were practiced in the precinct in question are tolerated. In our judgment the trial court did not adequately punish plaintiffs in error and respondent Singer. In *People v. Madel*, 337 Ill. 169, in passing upon a like point made in an election contempt case brought under the statute, the court said (p. 172):

"It is contended that the punishment of one year's imprisonment in the county jail is excessive. These men accepted the trust of conducting the election at their poll according to law and deliberately betrayed that trust by making a false return of the vote, in open contempt of the court whose officers they were declared to be, thus not only depriving the voters of their share in the government but using it against their wishes. The statute has not fixed the limit of the punishment, and the court having power to punish such act as a contempt of its authority, a year's imprisonment does not seem excessive for such gross and willful contempt."

The fact that Rivlin and others had not been apprehended at the time of the trial should have had no weight with the trial court in the matter of punishment, although the record shows that it did, but that fact worked to the benefit of plaintiffs in error and respondent Singer. The further fact that the trial court saw fit to recite his experiences in other contempt proceedings involving election frauds is not material, as the guilt of plaintiffs in error and respondent Singer is clear and the punishment imposed upon them inadequate.

It is contended that the judgment order is fatally defective because it contains no placita for the November term at which the judgment order was entered.

Petitioner, by leave of court, has filed a supplemental record showing a placita for that term.

Respondent Singer contends that the judgment order is void as to her because it was signed and entered when she was not present in open court. There is no merit in this contention. A judgment order was entered December 1, 1933, finding plaintiffs in error Rabinovitz and Arieu guilty, and at the same time ordering that the case as to respondent Singer be continued until December 7. The writ of error in the instant case, No. 37,266, is on behalf of plaintiffs in error Rabinovitz and Arieu. The judgment order as to respondent Singer was entered on December 7, 1933, and she sued out a separate writ of error in this court, No. 37,271, to reverse the judgment entered against her *on that date.* The judgment order of December 7 recites that respondent Singer was present in court *in person* and by counsel at the time of the entry of the order and it also recites that various motions were then made by her counsel on her behalf. As we have heretofore stated, the two causes were consolidated for hearing in this court.

The hearing of the petition in the instant case was before Hon. Charles T. Allen, county judge of Lake county, Illinois, and the final contention of plaintiffs in error and respondent Singer is that that judge was without jurisdiction to try a proceeding like the instant one. We have considered the somewhat strained argument in support of the instant contention and find it without merit.

From anything said in this opinion, we must not be understood as holding or intimating that the ''misbehavior'' referred to in section 13 necessarily involves an act or acts of a criminal character.

The judgment of the county court of Cook county in the instant case (No. 37,266) will be affirmed.

*Affirmed.*

GRIDLEY, P. J., and SULLIVAN, J., concur.