People of the State of Illinois ex rel. John S. Rusch, Appellee, v. Fred Savaiano et al., Appellants.

Gen. No. 39,711.

DENIS SULLIVAN, J., dissenting.

Opinion filed February 2, 1938.

THOMAS MARSHALL, of Chicago, for appellants.

THOMAS J. COURTNEY, State's Attorney, for appellee; JOHN F. CASHEN, JR., of Chicago, of counsel.

Mr. Justice Hall delivered the opinion of the court.

Under section 13 of art. 2 of Election Laws, (ch. 46, ¶ 267, Ill. State Bar Stats. 1935; Jones Ill. Stats. Ann. 43.277), a proceeding was begun in the county court of Cook county in and by which the respondents were charged with misconduct as judges and clerks in a primary election in the 31st precinct of the 20th ward in the city of Chicago, held on April 14, 1936. Each was found guilty of contempt of court, and each was sentenced to imprisonment in the county jail of Cook county for a term of one year. This is an appeal by each of the respondents from the judgment and order by which they were found guilty and sentenced.

The trial court found that Fred Savaiano, Mike Corso and Carmen Bagnola, while serving and acting as judges at such election, and Alex J. Morelli and John Cantore, as clerks, had called and recorded the votes contrary to the statute, had unlawfully assisted and acquiesced in assisting voters to vote without first examining them as to their disability and inability to vote and without requiring them to make oath concerning their disability and inability to mark their ballots; had permitted persons to vote whose names did not appear on the register; had assisted voters and had fraudulently marked ballots in the voting booths without a representative of the opposite political faith being present at such time, and without the voter asking for assistance and without the voter being illiterate; had permitted ballots to be changed after being voted, had unlawfully permitted and acquiesced in permitting 14 names to be placed upon the poll books between the hours of 4:20 and 5:00 p. m., such 14 names not representing persons that were present and voting; had allowed liquor to be consumed in the polling place; had permitted and acquiesced in permitting William Cavico to examine the official registers, and to direct certain

of the clerks of election to place the names of these 14 persons on the poll books, the said 14 persons not being the names of persons present in said polling place at the time of presenting themselves to vote; that the judges permitted and acquiesced in permitting James Prignano and William Cavico to examine the official ballots cast at the election, and fraudulently permitted James Prignano and William Cavico to alter and change the official ballots of voters, and that Fred Savaiano, Mike Corso, Carmen Bagnola, Alex J. Morelli and John Cantore each, while serving and acting as judges and clerks in the primary election, fraudulently made a false canvass, tally, proclamation and return of the votes cast in the precinct named.

Many points are presented by counsel for the respondents to support the charge that the entire proceedings in the county court, and the statute under which the proceedings are prosecuted, are invalid. An examination of the briefs filed in *People ex rel. Rusch v. Williams,* 292 Ill. App. 228, indicates that exactly the same points were raised and by the same counsel in that case as are raised here, and upon this subject, this court said:

"Counsel for defendants make a number of points with reference to the validity of the proceedings and of the statute. It is sufficient to say that these points have already been considered and passed upon adversely to defendants' contentions in a number of cases. *Sherman v. People,* 210 Ill. 552; *People v. Blackwell,* 342 Ill. 223; *Catherwood v. Morris,* 360 Ill. 473, 479; *People v. Enger,* 364 Ill. 464." See also *People ex rel. Rusch v. Rivlin,* 277 Ill. App. 183, and *People v. Hoffman,* 116 Ill. 587.

Prior to the hearing in the county court, the respondents prayed for a change of venue, which prayer was denied. In *People ex rel. Rusch v. Williams,*

*supra,* the same prayer was presented by the same counsel who represents respondents here, and the same order was entered.  In that case this court said:

"It is also argued that the trial court should have granted defendants' prayer for a change of venue. The point is without merit.  Sec. 13, art. 2 of the Elections Act, Ill. State Bar Stats. 1935, ch. 46, ¶ 267 ; Jones Ill. Stats. Ann. 43.277, makes judges and clerks of election officers of the county court, and as such liable in a proceeding for contempt for any misbehavior in their offices.  We do not understand how there could be any change of venue from the court trying its own officers for contempt."

In *Crook v. People,* 16 Ill. 534, in the circuit court of Peoria county, upon a bill filed in chancery, an injunction was allowed, a writ issued and served upon the defendants by the sheriff of Peoria county.  Thereafter, an affidavit was filed by the complainant charging the defendants in the bill of complaint with a breach of the injunction.  A writ of attachment issued compelling the defendants to appear at a rule day to answer for the breach.  After a hearing, defendants entered into a recognizance for their appearance at the following term of the circuit court of Peoria county, and at this term they filed their affidavit for change of venue, and the circuit court of Peoria county entered an order changing the venue to Tazewell county. Thereafter, it was ordered by the circuit court of Tazewell county that the proceedings for contempt be remanded to Peoria county, and on appeal from this order, the Supreme Court said:

"Informations against persons for contempts, in disturbing the order of court in its presence or out of it, for breach of injunctions, and disobeying its orders and decrees, and such like, are not within the meaning, nor of the character of informations, in the 5th section of the act in relation to change of venue, Rev.

Statutes, 528. Informations, within the meaning of said act, are such as are punishable under the provisions of the criminal code, upon presentment of the grand jury, informations filed ex-officio by the State's attorneys, and on appeals from justices of the peace, etc. The order of the Peoria circuit court, changing the venue in this case, was simply void, and did not have the effect to divest the court of its jurisdiction, and no order of the Tazewell circuit court was necessary to reinstate it.''

In *Lester v. People,* 150 Ill. 408, a fine had been imposed upon one Lester for contempt in refusing to comply with the order of the circuit court of Cook county to produce certain books for inspection by plaintiff and his attorney, in order to enable them to prepare for trial. Upon the defendants having failed to comply with this order, an attachment was entered against them for contempt. Upon a hearing upon the attachment, Lester was fined $200, and ordered to stand committed until the fine and costs be paid. From this order, an appeal was taken to the Supreme Court, and we call attention to the fact that *Crook v. People, supra,* is there cited with approval, upon the question as to what is a civil and what is a criminal contempt. Upon this question, the Supreme Court, in *Lester v. People, supra,* said: ''We are of the opinion that this proceeding, although criminal in form, is purely a civil remedy, intended to enforce the private right of the party litigant. There is, as held in *Howard v. Durand,* 39 Ga. 358, a clear distinction, both upon principle and by the authorities, between that class of cases where it is sought to vindicate the authority or dignity of the court, and those where the proceeding is remedial, and intended to compel the doing or omission of an act necessary to the administration of justice in enforcing some private right. In *The People v. Compton,* 1 Duer, 572, it is said that 'a solid and obvious distinction' ex-

ists between contempt cases strictly, and those acts denominated contempts which are punished as such only for the purpose of enforcing a civil remedy. In *Crook v. The People*, 16 Ill. 534, we said: 'Proceedings as for contempt are recognized as a right of the party in interest, and distinguishable from merely criminal contempts.' '' Numerous cases are cited in support of the court's finding.

The proceeding in this case, as stated by this court in *Rusch v. Williams, supra,* is purely statutory. In the section of the act referred to, to wit: section 13, art. 2 of the Elections Act, Ill. State Bar Stats. 1935, ch. 46, ¶ 267; Jones Ill. Stats. Ann. 43.277, after providing for the manner of appointing judges and clerks of election, and the confirmation of their appointment by the county court, it is provided that: ''After confirmation and acceptance of such commission, such judges and clerks shall thereupon become officers of such court and *shall be liable in a proceeding for contempt for any misbehavior in their office,* to be tried in open court on oral testimony in a summary way, without formal proceedings, but such trial or punishment for contempt of court shall not be any bar to any proceedings against such officers, criminally, for any violation of this act.'' (Italics ours.)

In *Johnson v. Von Kettler,* 84 Ill. 315, the Supreme Court, in passing upon the question as to the jurisdiction and power of county courts, said: ''Power [of county courts] to imprison is a special, statutory power, and can be exercised only in the cases and in the manner specifically prescribed by the statute.''

In *Sherman v. People,* 210 Ill. 552, an appeal from a contempt order was entered under the same section of the statute as is invoked here and for substantially the same offense as is charged against these defendants, and the question was raised there as to the power of the county court to punish for contempt under this statute. In upholding the right of the county court to

so act, the Supreme Court said: "It has . . . always been the right of courts of record to punish for contempt, not by virtue of any specific legislative authority, but by the common law; and in recent years this power has been greatly enlarged so as to cover a multitude of cases, some of which are not entirely judicial in their nature. Courts have power to punish, in certain cases, administrators, executors, guardians, masters in chancery, reporters, sheriffs, bailiffs, clerks, jurors, attorneys and receivers. Some of these are merely ministerial officers of the court, charged with no duties which are judicial in their character, and yet where a court appoints officers to act with reference to the subject matter committed to it for administration, it is necessary that these officers should be concerned with the judicial conduct of the court, and hence guilty for violation of the same. . . .

"The misbehavior referred to in the statute does not mean any misbehavior at the mere caprice of the county court, but refers to misbehavior of the judges in connection with the duties of their office,—to conduct in violation of the law and the instructions which they have received concerning their duties."

In the case at bar, we are of the opinion that the contempt charged here is in the nature of a criminal contempt; that the purpose of the statute is that in case of its violation, the penalty provided may be imposed in order to vindicate the authority of the court with respect to matters connected with the holding of elections, and that it is distinguished from the class of cases where the proceeding is remedial. See *People v. White,* 334 Ill. 465, Also, our opinion is that the court was not in error in refusing to grant the change of venue.

It is also urged by counsel for respondents that the court had no right to recount the ballots, nor to consider the tally sheets, ballots and other documents and papers used in the election, showing the returns made

by these officials, but that under the statute, nothing but oral evidence should have been received upon the charge made. The same counsel, in *People ex rel. Rusch v. Williams, supra,* in the county court and here, urged this same point, and this court there said:

"It is also said that the trial court had no authority to recount the ballots as the proceedings contemplate a hearing 'on oral testimony' exclusively. We do not read the statute as limiting the character of evidence which may be submitted in this proceeding. It is self-evident that the court must, in passing upon the charges, consider the tally sheets, ballots, or any other documentary or oral evidence from which the court may determine the innocence or guilt of the parties accused."

Sam Hair, a fourth year University of Chicago student and a watcher at the election in question, testified, in substance, that he arrived at the polling place on the morning of the election at 5:50 a. m., and remained until after 12 o'clock the next morning, and that he was present in the polling place during the entire time; that he saw the ballots when they were opened up in the morning, and that he watched the entire election procedure; that respondent Bagnola assisted at least 100 voters and Savaiano and respondent Corso at least 25 each; that the persons mentioned went into the polling booth with each individual voter, and either told the voter how to mark his ballot, or that the persons mentioned marked the ballots themselves; that occasionally a judge would ask a person if they needed assistance, but there were no affidavits of voters needing assistance, filled out during the day; that at 3 o'clock in the afternoon, beer and whiskey were served in the back room of the polling place; that at 20 minutes after 4 o'clock in the afternoon, there were 415 names on the poll books, and that at 5 o'clock there were 444 names on the poll books, and that be-

tween 20 minutes after 4 and 5 o'clock, no more than 15 people voted. He also testified that William Cavico had charge of the poll books, and that he gave extra names to the clerks, which names the clerks wrote in poll books; that after the polls were closed at 5 o'clock, the ballot boxes were opened and the ballots sorted; that shortly thereafter the entire board went out for dinner and came back about 6:30 o'clock and began the count; that Prignano, the democratic precinct captain, took the democratic ballots, and with a pencil and eraser changed the markings on them, which took about two hours; that Corso and Morelli were tallying the republican votes during this time, and that the other judges stood by while Prignano and Cavico went through the democratic ballots; that by this time, there were about 15 people in the polling place. This witness further testified that he made notes of various matters in connection with the election, and the next day turned these notes over to McQueeny of a private detective agency; that prior to the election, McQueeny had demonstrated to a school of prospective watchers the method by which elections were held, and that for his services as a watcher, he was paid $10. He further testified that Mike Corso voted about 2 o'clock, that he voted again about 2:10, and that he saw him vote again about 3:55, and that he saw him put his ballots in the ballot box. It is stipulated that, if she were present, one woman whose name appeared as having voted, would testify that she did not vote at the April 14th primary.

Larry Grandahl testified, in substance, that he was a student at the University of Chicago, and that he was a watcher at the election in question; that he arrived at the polling place about 6 o'clock in the morning, and remained there until after midnight; that 40 per cent of the voters voted "as though by instruction"; that the voter would come in and ask for instructions, and

that he would be accompanied to a booth by one of the judges, sometimes by both judges; that no affidavits were made out, and that later in the afternoon his attention was called to the fact that the clerks were writing names in the poll books; that one of the clerks, Morelli, would get the names from a worker who was getting these names from William Cavico, who was getting the names from the register; that a large percentage of the vote was cast between 2 and 4 o'clock. This witness also testified to the effect that he looked at the poll book and then counted the people who came in and voted between that time and closing time, and that his report showed there was a discrepancy of about 15 votes. His testimony was also, to the effect that the officials and workers split up in three groups, one working on democratic, one on republican and one on proposition ballots; that he watched the republican end, and that most of the time the republican ballots were counted and recorded in a manner known as "keeping a dummy tally sheet"; that Cavico did "writing and erasing on ballots"; that he saw one Victor Gallanti vote more than once, and that this person accompanied voters into the booths, and that there was no judge or clerk present with Gallanti and the voter at this time. He also testified that prior to the election, a Mr. Kennon of the employment agency of the University of Chicago had asked for persons who desired to work at the polls, and that at this time McQueeny of the detective agency gave certain of the students credentials and instructions. He testified that there were about 100 University of Chicago students who acted as watchers in various precincts in Chicago at this election, and that he was paid for his services.

Rudolph B. Salmon, a handwriting expert, testified that he had been a witness on disputed documents over 200 times; that after the election in question held on April 14, 1936, he examined the ballots for the purpose of determining the similarity of crosses and any other

alleged irregularities; that he found numbers of them which, in his opinion, were each marked by more than one person, and that many other ballots, in his opinion, were marked and changed by persons other than the voters. The record indicates that as these ballots were referred to by the witness, they were exhibited to the court. The ballots are not in the record.

Mike Corso, one of the republican judges at this election, testified that on the morning of the election the judges opened up the packages of ballots consisting of 100 each; that the polling place was on DeKoven street, east of Halsted street, in a basement; that the voting was done in the front room, which is about 18 feet wide and 30 feet long; that 444 votes were cast in the precinct. This witness testified that 25 per cent of the voters asked for assistance, and that the package of affidavits was opened up early in the morning; that these affidavits were used in connection with assisting voters. This witness stated that he made certain of such persons sign an affidavit, but that affidavits were not signed in all cases; that when a voter called for assistance, he would call another judge and they would both go into the booth and assist the voter. This witness further testified that in the morning he noticed a gallon of liquor on the sink, after everything had been sealed up and counted. He testified that Cavico handled no ballots, and that he was checking the names off of a card, and that Prignano did not alter any ballots. He denied that he voted more than once. He testified that Bagnola did not mark any ballots, or that the clerks wrote names on the poll books when nobody was voting. Bagnola, another judge of the election, testified to the same effect as did Savaiano, a republican judge.

Alex Morelli, testified that he was an apprentice druggist at 1330 South Sangamon street; that he had been a republican clerk of election before this election; that he was not in the habit of drinking, and did not

see any drinking going on at the polling place during the election. He also denied that there was anything irregular about the election, as did John Cantore.

Mildred Caduto, a democratic worker, testified that there were no republican workers at the polling place on that day; that she knew the judges; that she saw the count, and that no one took part in the count except the judges; that no one interfered with the ballots, and that she saw the ballot boxes opened up.

John Nawrancy, another watcher, testified that no one but the judges handled the ballots; that no one made erasures or markings on the ballots; that he was at the polling place from 5 a. m. to 12 o'clock at night; that he saw no one drink beer, whiskey or anything of the kind, and that he, the witness, was not a drinking man. Anthony Mango and Frank Piagaro, both democratic watchers, testified to the same effect.

The trial court sat and heard the witnesses, had the same opportunity as the handwriting expert to examine and observe the ballots and we are not prepared to say that the finding of the court is not justified by the evidence. If the respondents are guilty of the offense charged,—and the evidence seems to prove that they are—then the penalty imposed by the court is not too severe. The judgment of the county court of Cook county is, therefore, affirmed.

*Affirmed.*

Hebel, P. J., concurs.

Mr. Justice Denis E. Sullivan dissenting:

I am obliged to dissent for the following reasons:

1. The information does not charge a conspiracy and, consequently, the clerks should not be found guilty of things which, if true, were only done by the judges and vice versa.

2. The election statute did not change or repeal the change of venue statute and this is a "suit or proceed-

ing" within the purview of ch. 146, Ill. Rev. Stat. 1937, § 1 *et seq.;* Jones Ill. Stats. Ann. 107.316 *et seq.,* entitled, "Change of Venue."

3. This is a civil and not a criminal contempt. If it were a criminal contempt the respondents would have to be discharged on their answer. Whilst it is important that the purity of the ballot be maintained, I think it is of equal importance that citizens charged with an offense be tried in accordance with the law and before a judge not disqualified. The defendants were not guilty of criminal contempt. See *People v. Mc-Donald,* 314 Ill. 548, and cases therein cited.

4. I think the court erred in preventing the cross-examination of the witness Salmon who was introduced by the State as an expert and testified to possessing the extraordinary power of being able to tell by looking at two straight lines whether or not they were made by the same person. I think the counsel, Mr. Rathbun, was well within his rights in insisting upon a cross-examination of the expert as to how he acquired and possessed this extraordinary power.

5. The written summary of the findings of the expert Salmon was read by the trial judge over the objection of Rathbun and taken as evidence. Whilst the statute, ch. 46, § 381, Ill. Rev. Stat. 1937; Jones Ill. Stats. Ann. 43.400, entitled, "Elections" states that cases shall be tried "in open court, on oral testimony, in a summary manner, without written pleadings," I do not think the legislature intended to do away with the protection to which an accused is entitled at all times when in court charged with an offense. The presumption of innocence, the burden of proof, a change of venue and the right to cross-examine have all been proven to be safeguards of justice and too firmly established in our jurisprudence to be denied at this time and as they were in the instant case.

6. Two witnesses were produced by the State who testified to the facts upon which this conviction is

based. These two were employees of the Detective McQueeny and were paid $10 a day for their services, including the day they testified in court. They had been schooled by McQueeny and had been instructed as to what they should look for at the election polls.

7. Ten witnesses were produced on behalf of the defense who denied the wrongdoing and the intent to do anything which would constitute an offense. Whilst the familiar rule is that the trial court who sees the witnesses and hears them testify is in a better position to judge as to their credibility, than is a court of review and that the number of witnesses testifying on one side or the other is not controlling, nevertheless, there are occasions when the printed page reveals certain statements that were apparently overlooked at the time of the trial, and the number of witnesses testifying cannot be wholly disregarded in determining the weight of the evidence. I do not think this record is supported by proof so clear and convincing as to justify the affirmance of the judgment.

The punishment of one year in the county jail for all defendants is too severe. Investigations and experience have shown and I think that it is almost universally conceded throughout the civilized world by those who have given the subject any thought, that it is the certainty of punishment and not the severity of punishment that acts as a deterrent to the violation of law.

For the reasons I have given I think the judgment should be reversed and the cause remanded with directions that the cause be tried in accordance with the law.