THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LEVI Q. BLAKE, Defendant-Appellant.

Third District    No. 3—87—0514

Opinion filed April 21, 1988.

Thomas A. Lilien, of State Appellate Defender's Office, of Ottawa, for appellant.

John A. Barra, State's Attorney, of Peoria (Terry A. Mertel, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STOUDER delivered the opinion of the court:

The defendant, Levi Q. Blake, was charged with the offenses of home invasion, armed robbery and residential burglary. A jury found him guilty of all three offenses. The trial court entered a judgment of conviction for home invasion and sentenced him to 12 years' imprison-

ment. The defendant appeals his conviction, arguing, *inter alia*, that the jury should have been instructed on necessity.

The State presented the following evidence at trial. On February 1, 1987, Mabel Schadt was living at her two-story house at 613 Voris Street in Peoria. Because Schadt had had cataract surgery the previous August, her neighbor, Rosemary Maloney, would come to her house at about 7 p.m. each evening and spend the night. On January 31, 1987, the two women went to bed at around 11 p.m., after locking the doors and securing the house. They slept in separate bedrooms on the second floor.

At approximately 6 a.m. on February 1, Schadt was awakened by a noise and saw a young man push open her bedroom door. At approximately the same time, Maloney, who had been awake, saw a different man in the hall. She heard one of the men say "I'm going in and rough her up," and the other man say "I'm going on in her room and have some fun." The man who entered Schadt's room fired a pistol and went through her dresser drawers. After a few minutes, the man left her room and ran downstairs.

Schadt went to Maloney's room to help her. The man in Maloney's room told Schadt to lie down and struck her in the face with a gun. Maloney was already lying on the bed, since the same man had put the gun to her head.

The victims remained in the room for about five minutes. The man who had been in Schadt's room returned to that room and ransacked it. He made several quick trips downstairs. At one point the women heard him yell to someone downstairs, referring to him by a number. The women also heard someone downstairs yell to the man upstairs.

In the meantime, the Peoria police were dispatched to 613 Voris. Officer Dale Whitledge arrived first. He inspected the exterior of the residence and saw that the back door had been broken into. He then saw two men appear at the back door. When Whitledge drew his gun and yelled at them to stop, they slammed the door shut, remaining inside.

Officer Jeff Adams saw a man jump through the window of the first-floor dining room and run from the house. Adams pursued the man. When the man pointed a gun and fired a shot at Adams, Adams returned fire, killing the suspect. The deceased, later identified as Willie James Dixon, had a .22 caliber revolver in his hand. The gun had one spent round and five live rounds.

Whitledge saw a man jump out of Schadt's bedroom window, onto the roof of the back porch, and then into a neighbor's yard. Whitledge

apprehended the man, Anthony Dixon, nearby. Whitledge found a starter's pistol on the ground near where Anthony had landed. The gun would only fire blanks or caps.

The officers next went into the house to check on the women. Schadt had bruised shoulders and an open wound on her face. The women could not identify the assailants or describe them in detail. A color television set, microwave oven and clock were missing from the house. The officers searched the entire house, including the attic, but found no one.

That same morning, the police found the missing television, microwave oven and clock in an alley a block away. There were two sets of footprints in the snow running from the items toward the general direction of Schadt's residence. Once of the footprints matched a shoe worn by Willie Dixon. A latent thumbprint taken from the clock matched the defendant's left thumbprint.

Around 1:30 p.m. that day, Phillip Benne was inside Schadt's home when he heard a noise upstairs. Benne went to the attic, opened the lid of a cardboard barrel and found the defendant inside. Benne asked the defendant who else was with him and where his gun was. The defendant responded: "My cousins Anthony and James. Man, I don't have no gun. Where's Anthony? Is he in the hospital?" The defendant did not have a weapon.

The defendant gave an oral statement to the police on the afternoon of February 1. According to the defendant's oral statement, he was at a party until 3 a.m.; then he accompanied Anthony Dixon to Anthony's apartment across the street. About an hour later, Anthony's brother Willie arrived. The defendant and the Dixons went for a walk. The three walked half an hour and came to 613 Voris. The defendant knew that Schadt lived there but did not know whether anyone was home that morning. The defendant went to the front of the house to act as a lookout. The Dixons went to the rear door of the house and forced the door. After remaining out front for 20 minutes, the defendant went to the rear of the house and waited by a fence. Willie carried items from the house to the defendant. When the police arrived a few minutes later, the defendant ran inside the house to warn the Dixons. He then ran upstairs and hid in the attic. The defendant denied having a gun at the house. He admitted having a cap gun earlier that night. The defendant stated that in response to Anthony's request he had given the gun to Anthony at Anthony's apartment.

After the oral statement, the defendant gave a written statement which repeated much of the oral one. The defendant indicated that at

Willie's request, he and Willie had carried a television, microwave oven and clock across the street from 613 Voris. Both Dixons were inside the house when the defendant entered to warn them about the police. The defendant did not know whose idea the break-in had been. He had not discussed it with the Dixons at Anthony's apartment.

At trial, the defendant testified on his own behalf. His testimony was as follows. He had known the Dixons for four or five months before February 1, 1987. The defendant had been at Anthony's apartment from morning until 7 p.m. on January 31, 1987. The defendant was drinking malt liquor from a 12-pack which he split with Anthony. The defendant could not recall having the blank gun with him at any time that evening.

Around 7 p.m., the defendant and Anthony went to a party across the street. There, the defendant became intoxicated. Willie later arrived at the party and brought with him some marijuana cigarettes. The defendant smoked the cigarettes, became drowsy and fell asleep at the party. He was awakened later by Anthony. The defendant wanted to sleep but reluctantly went with Anthony to his apartment.

At his apartment the defendant drank some whiskey and fell asleep. He awoke when Willie entered the apartment. Willie argued with Anthony. Anthony then grabbed the defendant and told him he needed fresh air. The defendant said that he was tired and drunk, but went outside with the Dixons.

When the defendant stated he was going home, Willie said that it was too late to walk home and that the defendant should go along to Willie's place. The defendant agreed to go with the Dixons if they would walk him home. The defendant stated that he was drunk and confused, and felt as if the Dixons had made the decision where to go for him.

The three men walked past Schadt's house. They then stopped and asked the defendant if he had lived near there. The defendant asked why the Dixons were interested. The Dixons then had a conversation in some sort of "pig Latin" which the defendant could not understand and walked back towards Voris. The defendant, still drunk, foolishly followed. He did not know what the Dixons were going to do.

The Dixons jumped over the backyard fence at 613 Voris. At this point, when the defendant said that he was leaving, Willie pointed a gun at the defendant and ordered him to climb over the fence. The defendant complied and told Willie not to shoot him. The Dixons went over to a basement window, kicked it and then decided to force the back door in. The Dixons went into the house. The defendant re-

mained outside.

The defendant continued to testify that once the Dixons entered the house, he began to walk away. Willie came out of the house and, while holding the gun in his hand, told the defendant he could not leave. The defendant then heard a woman scream inside the house. The defendant told Willie he would do anything so long as the Dixons left the women alone and Willie did not point the gun at him. Willie told the defendant to stay outside. He also told the defendant that if he found that the defendant had left, he would go upstairs and start shooting. According to the defendant, he agreed not to leave because he wanted to save himself and the women.

Willie came back outside with a television set, a microwave oven and a clock. Willie ordered the defendant to help him carry the items. When the defendant balked, Willie asked the defendant if he wanted to see the women die. The defendant said no and assisted Willie. The defendant followed Willie to a nearby garage, where they left the items. Willie ordered the defendant back to Schadt's home.

Willie told the defendant to come into the house because Willie did not trust the defendant outside. Willie went upstairs after telling the defendant to act as a lookout and saying that he would start shooting if he called down to the defendant and received no response.

After several minutes, the defendant saw the police arrive and begin to inspect the house. At the same time Willie asked Anthony and the defendant if everything was alright, referring to them as "number 2" and "number 3." Only after the defendant saw that the police had surrounded the house did the defendant warn the Dixons, in an effort to get them away from the women. As the Dixons attempted to escape, the defendant hid in the attic. He feared being shot if he revealed himself and had no idea how long he would remain in the attic.

According to the defendant, when later discovered, he was too afraid to tell the police the truth. He gave the police the information contained in the oral and written statements in order to get out of a holding cell.

On appeal, the defendant raises two issues. The first is whether the trial court erred in refusing the defendant's instruction on necessity. At the jury instructions conference, the defendant tendered instructions on the defenses of compulsion and necessity. The court accepted the compulsion instruction but refused the instruction on necessity. Rather, the court modified the compulsion instruction to include the concept of threat against another person. The instruction was given as follows:

"It is a defense to the charges made against the defendant

that he acted under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believed death or great bodily harm would be inflicted upon himself or another if he he did not perform the conduct with which he is charged."

■ The defendant argues first that under the definition of compulsion, a person is not guilty of an offense if: (1) he acts under the threat of imminent death or great bodily harm; and (2) he reasonably believes that death or great bodily harm will be inflicted if he does not perform the conduct which constitutes the offense. The defendant next argues that necessity justifies criminal conduct if: (1) the accused was without blame in developing the situation; and (2) the accused reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might result from his own conduct.

From the above, the defendant contends that the court's instruction did not adequately communicate to the jury his theory of defense: that he was acting to prevent a greater injury to the women. The defendant also argues that necessity does not require an imminent threat of harm. The defendant asserts that the jury may have rejected his compulsion defense because he was not imminently threatened while the Dixons were inside the house.

Compulsion is defined in relevant part by the Criminal Code of 1961 in the following manner:

"A person is not guilty of an offense, other than an offense punishable with death, by reason of conduct which he performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believes death or great bodily harm will be inflicted upon him if he does not perform such conduct." Ill. Rev. Stat. 1985, ch. 38, par. 7—11.

The defense of necessity (Ill. Rev. Stat. 1985, ch. 38, par. 7—13) is defined as follows:

"Conduct which would otherwise be an offense is justifiable by reason of necessity if the accused was without blame in occasioning or developing the situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct."

The defense of compulsion generally requires an impending threat of great bodily harm together with a demand that the person perform the specific criminal act for which he eventually is charged. (*People v.*

*Unger* (1977), 66 Ill. 2d 333, 362 N.E.2d 319.) Necessity, on the other hand, justifies illegal conduct if that conduct was the sole reasonable alternative available to the defendant given the circumstances of the case. (*People v. Perez* (1981), 97 Ill. App. 3d 278, 422 N.E.2d 945.) Necessity involves a choice between two admitted evils where other options are unavailable. (*People v. Krizka* (1980), 92 Ill. App. 3d 288, 416 N.E.2d 36.) It is well settled that only slight evidence is necessary to warrant the giving of appropriate instructions. *People v. Bratcher* (1976), 63 Ill. 2d 534, 349 N.E.2d 31.

▇ In the case at bar, the defendant's testimony, if believed, indicated that he was without blame in occasioning the situation. The defendant stated that he was drunk, that he thought that the Dixons were walking him home, and that Willie ordered him at gunpoint to participate in the robbery. The defendant's testimony further indicates that as the events progressed, he feared that his noncooperation with the Dixons would cause them to injure the women. If the jury believed his testimony about that fear, it could find that the defendant was forced to choose between the lesser of two admitted evils. The jury instructions given by the court failed to address the possibility that the defendant did not exercise free will, but rather chose to act illegally to avert the injury or death of Schadt and Maloney. We find that the court erred reversibly in refusing to give the defendant's tendered instruction on necessity. Because of our holding, we need not address the defendant's remaining issue.

Accordingly, the judgment of the circuit court of Peoria County is reversed. The cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

SCOTT and HEIPLE, JJ., concur.