THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DONALD C. SCHERZER, Defendant-Appellant.

Second District   No. 2—87—0725

Opinion filed February 9, 1989.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, and Daniel D. Yuhas and Arden J. Lang, both of State Appellate Defender's Office, of Springfield, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Robert J. Biderman, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Donald Scherzer, was charged by indictment in Du Page County with attempted murder, conspiracy to commit murder, armed violence (based on aggravated battery), aggravated battery, and armed robbery. (Ill. Rev. Stat. 1985, ch. 38, pars. 8—4(a), 8—2(a), 33A—2, 12—4(a), 18—2(a).) The conspiracy charge was nol-prossed, and a jury found the defendant guilty of the remaining charges. The trial court merged the aggravated battery conviction into the one for armed violence and imposed concurrent 14-year terms on the defendant for each of the three remaining convictions.

The defendant raises four issues: (1) whether he was proved guilty beyond a reasonable doubt; (2) whether the court erred in admitting redacted transcripts of a conversation between the murder solicitor and defendant's codefendant; (3) whether the court erred in refusing to instruct the jury on the affirmative defense of compulsion; and (4) whether the armed violence conviction must be vacated because that offense and the attempted murder were based on a single act and because the verdicts are legally inconsistent.

The charges arose from the October 4, 1985, attempted murder of Carol Hamman. At trial, the State presented evidence that defendant

and his business partner, William Moore, were paid by Hamman's husband, Lloyd, to murder her and that Moore and the defendant entered Carol Hamman's residence, where she was beaten, strangled, and left for dead. The defendant's theory at trial was that he had been duped by William Moore into believing that no violence would occur, that he personally engaged in no violence, and that he had been tricked and forced into participating in the crime.

Carol Hamman testified that in August 1984 she moved out of the home she shared with her husband, Lloyd, and into the Naperville home of her friend, Barbara Garelli. On October 3, 1985, a man, whom she identified as William Moore, came to her door and told her he was interested in buying the Garelli residence. Hamman gave Moore a 10- to 15-minute house tour. Hamman explained to Moore her girlfriend owned the home, and Moore said that if he was interested in purchasing the residence, he would contact the realtor. Hamman told him that her girlfriend was leaving for Florida the next day.

Moore returned the next evening about 7:10 with a man Hamman identified as the defendant, who was introduced by Moore as his partner. Hamman showed the men around Garelli's home for about 20 minutes, and, while she was walking from the master bedroom to the guest bathroom, she was hit from behind. Hamman did not know which man had been standing directly behind her. Everything went blank until she awoke facedown in the bedroom. She saw two figures and felt someone yanking at her right hand and fingers. She could not move her left hand. She asked the men to stop hurting her. They kept beating her, and she passed out. She then felt her head being jerked up. She felt a plastic rope or cord around her throat and had the sensation of being strangled from behind until she passed out again. Hamman stated that she could not determine which man or if both were doing the strangling because she was lying facedown on the floor.

Hamman later regained consciousness, stood, went into the bathroom, looked in the mirror, found herself covered with blood, and wrapped several towels in succession around her head. She went into an office bedroom to telephone for help but the telephone cord was missing. Using the kitchen phone, she telephoned her girlfriend, Ruth Portwood, at work. Portwood arrived at the Garelli residence within 10 to 15 minutes. The paramedics and police arrived soon afterwards.

Hamman was transported to the hospital where she noticed her wedding rings, sapphire cocktail ring, earrings, and a gold necklace bearing her name were missing from her body. She received 100 stitches in her head and eye. She sustained two broken knuckles and

one broken finger.

On cross-examination, Hamman testified that she had filed for divorce in August 1985 and sought $250,000 in alimony. She remembered the telephone ringing at the Garelli residence on the night of October 2. Her friend Barbara answered, a man's voice asked for Carol, and she handed Hamman the telephone. All Hamman heard was breathing, and she hung up.

Ruth Portwood testified that after the police arrived, she walked through the house and found blood on the bedroom floor, walls and woodwork. Hamman's gold necklace, which bore the name "Carol," was lying in a pool of blood on the master bedroom floor.

Naperville police officer Larry Dickson discovered also an earring clasp and earring in the bloodstain in the master bedroom. In the office bedroom, he found a red stain on a chair rail and a telephone receiver with no cord lying on the couch. The phone cord was never recovered.

Dickson identified a three-eighths inch diameter piece of metal marked S.R., the logo for the Sturm Ruger Firearms Company, which he had found. This logo usually appears on the wooden handle of a revolver, a third of the way from its base. Two feet from the bloodstain he also found a small piece of wood. Dickson believed that the wood came from a firearm handle, but he could not identify its manufacturer, nor could he determine the caliber or size of the weapon.

It was stipulated that if emergency room doctor Joellyn Reese testified, she would state Hamman had been treated for multiple lacerations to her scalp, most of which were to the bone. Forty sutures to the skin and 10 to the tissue below the skin were required. Reese's opinion was that Hamman's injuries were consistent with being struck repeatedly with a hard, blunt object such as a gun. Lacerations on Hamman's right index finger and an associated fracture were consistent with Hamman's being struck on the right hand with a blunt instrument. In addition, there were multiple bruises on Hamman's neck which indicated that she was choked by hand. Reese did not observe any injuries indicative of Hamman having been strangled with a cord or rope.

Naperville police detective Michael Cross testified that in investigating the crime, there were conversations with Lloyd Hamman and William Moore. On October 11, Cross went to Moore's Meat Market in Naperville, which was owned by Moore and the defendant. Cross went to the defendant's apartment above the market at 8 p.m. and told defendant that Moore had been arrested for the October 4 attack on Hamman. The defendant denied any knowledge of the incident.

When asked, he told the officers that he had a gun in his car trunk, and he authorized a search of his car and the market.

Cross testified the defendant denied being with Moore on October 4, but he agreed to go to the police station, where he was fingerprinted and photographed. At 10 p.m., he gave Cross some background information about himself. The defendant stated he and William Moore lived in the same neighborhood in Mundelein between 1976 and 1981 and that their children played together. Moore was a meatcutter and asked the defendant to go into business with him in 1983 or early 1984, but the deal fell through. In 1984 the two bought a meat market in Naperville and named it Moore's Meat Market. The defendant found Moore to be a nice guy but a person who liked to brag. Once Moore bragged about planning bank robberies. The defendant again denied his knowledge of the October 4 incident but showed signs of being nervous. Cross told the defendant he did not think he was telling the truth and that he believed the defendant had gotten involved in something over his head. The defendant then stated that he "was there."

In an oral statement to Cross after being advised of his *Miranda* rights, the defendant stated that two months prior to October 4, Lloyd Hamman, a frequent customer of the market, entered the store and asked if Moore would "take care of" his wife. Hamman and Moore had several conversations in this vein, and on August 25, Lloyd asked Moore to kill his wife for $25,000. The defendant thought that this was just talk, but he received $6,250 from Moore, which was half of the initial $12,500 Hamman had promised Moore for killing his wife. The defendant spent some of the money to pay bills, bought some appliances and a VCR, and loaned $2,800 back to Moore for the purchase of a car. According to Cross, the defendant related the plan was for Moore to view the house where Carol Hamman was staying, which was for sale, return later with him, introduce him as his partner, and they would kill Carol Hamman. The defendant and Moore drove by the house four or five times during the two weeks prior to October 4. Moore told the defendant that he had entered the home, viewed it, and seen Carol Hamman.

The defendant told the officer that they closed the store at 6:30 p.m. on October 4. He went upstairs, cleaned up, told his wife he was going out for the evening with Moore, and left. They drove to the house where Carol Hamman was staying. Moore rang the doorbell and introduced the defendant to Carol Hamman as his business partner. Hamman let Moore and the defendant in to tour the house. As Moore, the defendant and Hamman left the master bedroom, Moore

pulled out his .357 Magnum revolver and hit Carol Hamman three to four times on the head until she fell. The defendant told Cross he took the wedding ring from Hamman's finger and put it in a bag with other jewelry taken from the house. Cross stated the defendant told him he could not remember who strangled Hamman with the telephone cord. After the incident, the defendant and Moore went to the market to clean up and then went to Niles to O'Donovan's Tavern, where they planned to go to have drinks and play darts in order to establish an alibi. They threw the bag with jewelry into the dumpster near O'Donovan's. The last place the defendant saw the gun was in the back room of the meat market.

Detective Cross identified people's exhibit No. 14, which was a voluntary statement the defendant wrote on October 11 immediately after giving his oral statement. With several grammatical corrections, the statement reads as follows:

"About two months ago, Bill told me of a customer who has shopped with us since we took over the store. He told me he wanted his wife taken care of. I believed that this was just another one of his stories, that he planned to take this Lloyd for money because he would have no one he could tell. So I went along with it. This went on for weeks which only convinced me more it was only a con to get his money. We went by the house, but there was always a reason that nothing could be done. Then on that Friday night we stopped in front of the house, and got out. I still was sure that nothing would happen, so we went to the house and inside. We went through part of the house and everything was fine. Then as we were leaving one of the bedrooms, Bill started hitting her. The next thing I remember, I pulled off her ring, and Bill was saying, 'Let's go, let's go.' I didn't believe what had happened. We drove to O'Donovan's in Niles. We shot darts and drank for a couple of hours, then went home. The sum of money to be paid was $25,000. Half before and half after. I never believed that there would be an after, because I didn't believe it would ever happen. I received $6,250 but Bill borrowed $2,800 back to get a car."

On cross-examination, Detective Cross remembered that when he asked the defendant about the phone cord, the defendant stated that it must have been put into the bag with the jewelry. In his written report, Detective Cross wrote that the defendant told him he did not know who had strangled Hamman, not that he did not remember who had strangled her. Cross remembered the defendant told him he could

not describe the jewelry that had been taken because things were happening so fast, he was in a daze because Moore had actually done it. Cross stated the defendant told him he never thought Moore would "go through with it."

On redirect examination after refreshing his recollection with his written report, Detective Cross stated the defendant did not remember what happened to the bag of jewelry because "he was in a daze that they had actually done it." On re-cross-examination, Detective Cross admitted the notes he took at headquarters from which his written report was reconstructed were not a verbatim account of the defendant's words.

Prior to the presentation of the defendant's case, defense counsel asked to have admitted the entirety of the taped conversation between Lloyd Hamman and William Moore which occurred after the attempted murder of Carol Hamman. During this taped conversation, Hamman was wired and acting as a police informant. The State objected on grounds of authentication, hearsay, and relevance. Following argument, the court stated that an edited version of the taped conversation could be presented to the jury. The edited version would contain the references regarding an alleged professional hit man, but no references to the gun which was discussed between Moore and Lloyd Hamman in the taped conversation.

Marcia Sherman testified as a character witness for the defendant. She stated that she was a housekeeper who had known the defendant for three years. She testified he had a reputation among her neighbors as an honest man and, in her opinion, was honest and truthful.

The defendant, 42-year-old Donald C. Scherzer, testified in his own behalf. He related the circumstances of his meeting and eventual partnership with William Moore in the meat-market business. In the second week of August 1985, Lloyd Hamman, a long-time customer of the market, came into the store and spoke with Moore. Moore later told the defendant that Hamman was having marital problems and wanted to be rid of his wife. This testimony and all other testimony relating to conversations between Lloyd Hamman and William Moore was admitted for the limited purpose that the conversations occurred, and not for the truthfulness of their contents. Moore said he told Hamman that he had a friend in Florida who is a professional hit man who could take care of the problem. The defendant testified he reminded Moore that Moore did not know any hit man. Moore replied that he and the defendant knew that, but Hamman did not.

The defendant testified that two or three days later, Moore and

Hamman had a second conversation in the meat market during which Hamman told Moore that his wife expected a $300,000 divorce settlement. Moore told the defendant that he told Hamman his Florida friend would charge $25,000, half of which was to be paid up front, to get rid of Carol Hamman. The defendant testified that when this was related to him, he shook his head and told Moore he was crazy because he did not know such a person and what if Hamman took him up on the offer. Moore just laughed, said, "I know," and went back to work.

The next week Hamman was just leaving the store when the defendant was coming in. Moore told the defendant to lock the door. Moore seemed all excited and stated, "The dumb son-of-a-bitch, he asked for it, he brought the money." Moore jerked on the defendant's arm and told him to go to the basement because he wanted to count the money. Moore showed the defendant a photograph of Hamman's wife which Hamman had supplied and which also contained some identifying information. The defendant told Moore he did not understand why Moore was so excited because he would have to give the money back since there was no hit man. They counted the money and found that $100 to $200 of the agreed-upon $12,500 sum was missing. Moore gave the defendant half the downpayment, which the defendant hid in some heating ducts in the basement. The defendant testified he was not convinced the scam on Lloyd Hamman could work, and he did not start using the money for 2 to 2½ weeks, after he became convinced the scam could succeed. Defendant loaned $2,800 back to Moore for the purchase of a new car.

The next evening Moore and the defendant drove past the house where Carol Hamman was staying to get information to keep the story going in order to make it seem more realistic. Moore was going to tell Hamman that he was going to be a scout for the hit man to get the layout of the neighborhood and the regular activities of the neighborhood people. The day after, Moore called Lloyd Hamman and told Hamman that he had sent the $12,500 to Florida, and he was going to get the job done as soon as possible. That night, Moore and the defendant drove past the house again to gather details for the story Moore had concocted. They saw a couple of people jogging and a man walking a small dog. The defendant drove past the Garelli home with Moore three times prior to October 4 over a four-to-five week period.

A week after the phone conversation with Lloyd Hamman, Hamman called, and, according to Moore, he was upset because the contract had not been completed. Moore claimed he told Hamman that he had no control over the hit man. The defendant told Moore he wished

Moore would come up with an end to the scam and finish it. During the early or mid-part of the next week, Hamman called the store and expressed his anger to Moore because his wife had gone to Florida for a vacation. Moore, in turn, became upset with Hamman on the phone, telling him the hit man was coming to town that week to do the job and now Moore would have to tell him not to come. Hamman offered to give Moore his wife's address in Florida so the job could be done there.

The next day, Lloyd Hamman handed the defendant a plain envelope to give to Moore. Later that day, Moore opened the envelope and found a paper with a person's name and a Florida address where Carol Hamman was staying. Moore laughed and threw the paper in the trash can. The defendant testified he told Moore he wanted him to understand that Hamman did not like how long it was dragging on, and the defendant told Moore he was worried Hamman would get tired of it and maybe do something else to harm his wife. Moore told the defendant not to worry and that he was going to come up with something because he, too, was sick of Hamman.

A week later, Moore reported to the defendant that he told Lloyd Hamman that the hit man was coming to town the next week. He intended to tell Hamman later that the hit man had been killed on a job in New York. The defendant told Moore he was glad because he wanted it to come to an end, but before Moore told Hamman, defendant said they should get together and call Carol Hamman and warn her of the danger she would be in. The defendant testified that the day *before* this conversation, he had made a phone call to Carol Hamman because it had been so long and he wanted it over with. It was his own plan to call Carol Hamman and say that he had overheard a couple of people in a bar talking about harming her or killing her and that she should contact the police. He called her the Wednesday before the incident, October 2, and asked for Carol. When someone else answered and called Carol to the phone, he lost his nerve and hung up.

On the evening of October 4, the defendant could not tell where Moore was taking him until he and Moore were three to four blocks from the Garelli residence. Moore originally told him that they were driving to O'Donovan's to shoot darts. Then Moore told the defendant he wanted to swing past the Garelli house one more time to gather more information to "beef up" the story with Hamman before he told him that the hit man had been killed. The defendant did not know Moore was wearing a shoulder holster and was armed with a .357 Magnum revolver. Moore pulled up to the house, opened the door and

told the defendant, "Come on, let's go." The defendant testified he hadn't realized up to that point that Moore wanted him to go with him. Moore explained that he had been to the house the night before and that he needed a reason for defendant to get in it and that Moore was going to tell Carol Hamman that the defendant was looking for a house, too. Defendant hesitated, and Moore stated, "[L]ook, you got $6,500 [*sic*], this isn't too much to ask for that, is it?"

The defendant testified his intention as he approached the Garelli residence was that he and Moore were going into the house to gather information to substantiate their story of scouting for the hit man just to make the story believable to Lloyd Hamman. The defendant stated his motivation for taking half the money was greed and the fact it seemed like easy money. He believed that he was participating only in a scam on Lloyd Hamman. He convinced himself to keep the money because he figured anyone who wanted that done to someone else "deserved to get ripped off of the money."

When Carol Hamman answered the door, Moore introduced the defendant to her as his business partner who was from out of town and also interested in buying a house. Hamman remembered Moore, and let Moore and the defendant in the house. Moore asked if the owner was present and was told by Hamman that Garelli was in Florida. Hamman conducted them on a tour of the house for about five minutes, and the defendant remained behind briefly in the master bedroom. As he switched off the bedroom light, he heard a scuffling noise ahead which turned out to be Moore pushing Carol Hamman against a wall. He saw Moore place his hand on the back of Hamman's neck and hit her on the head with a revolver several times. Moore then spun her around, and she wound up at the defendant's feet.

The defendant stated he was in shock and was scared and the only thing he could think to do was to get away or run away from there. He ran to the front door and stood there, shaking, not believing what had happened. He felt cold and clammy and was crying. While he was standing near the front door, he heard Moore in the background scream at him to come back. The defendant testified that "for some reason" he went back into the foyer and down the hallway, where he found Moore standing next to Carol Hamman, who was lying motionless, facedown on the hallway floor. Moore ordered the defendant to get her rings. The defendant stated he asked Moore if he was crazy, nobody was supposed to get hurt, and what was he doing? Moore stood three-to-four feet away from the defendant and pointed the gun at his stomach. Moore screamed, "I told you to get

the fucking rings. Just get the rings." The defendant got the rings and testified his state of mind at the time he did that was that he felt that he had no choice, that he had to do what Moore wanted him to do and that Moore was threatening him. The defendant believed he slid two rings from Hamman's fingers and that the rings went into Moore's jacket pocket. He remembered Moore hollering, "Let's go. Let's get out of here."

The defendant got into Moore's car, and Moore drove them back to the meat market to clean up. The defendant screamed at Moore in the car, asking him why he did it, and stating no one was supposed to get hurt, and that it was supposed to be a scam on Lloyd Hamman. Moore responded that he was tired of the defendant's crying and that if he knew what was good for him, he would keep his mouth shut. The defendant testified Moore told him he was "in this as deep as he was now and if he [Moore] went down, he was going to take [him] with him."

After Moore cleaned up in the basement of the market, Moore put his jacket into a grocery bag and told the defendant they were going to O'Donovan's in Niles to shoot darts because he planned that as an alibi. Moore was still armed at that time. Before entering the bar in Niles, Moore told the defendant to throw the bag with his jacket and some things which rattled around inside the bag into the dumpster behind the bar. Moore grabbed the defendant by the arm before they entered the tavern, looked him in the eye, and told him to keep his mouth shut if he knew what was good for him and his family.

While they were at O'Donovan's, Moore sat at the bar talking and joking. When the defendant returned from the bathroom, where he had splashed water on his face, Moore handed him a drink. Later, Moore drove them back to the meat market and threatened the defendant one more time. The defendant testified that he kept silent as he was told, and he never reported the situation. He thought Carol Hamman was dead, and he was afraid of Moore.

The defendant stated that after Moore dropped him off at home, he wandered around the grounds outside of the market for 15 to 20 minutes. Once inside, he told his wife he was ill and went to bed. The next day, Moore arrived at the store in the early morning and renewed his threats. The defendant was not at work from the next Tuesday until the time of his arrest because of a back injury.

The defendant stated that in his oral statement to Cross he denied knowing anything about a cord or even ever having seen a cord. He told Cross he did not know if Moore had taken any other jewelry because he was dazed "after it all happened, things were happening

so fast that [he] didn't know if [Moore] had taken anything else or not." The defendant told Detective Cross that he never thought Moore "could do anything like that." He told Cross he did not believe that Moore's .357 Magnum gun was in the bag he threw away at O'Donovan's because the bag wasn't heavy enough for that.

The defendant testified that he detailed for Cross a series of conversations between Moore and Lloyd Hamman which began two months before the October 4 incident and that he personally had no conversations with Lloyd Hamman. He told Cross he received half of the $12,500 and none was left. The defendant testified he did not indicate to Cross under what circumstances he went to the Garelli house on October 4, and he stated that on October 4, he did not intend Carol Hamman to have any kind of violence committed upon her. On cross-examination, the defendant stated that when Moore gave him the money, Moore did not tell him what he expected him to do in return for the money. He thought it was wrong to take the money, but he did not believe that anything was going to be done. His only understanding of Moore giving him the money was for his help in keeping the scam going with Hamman, but the defendant admitted he had no dealings with Hamman. He knew Hamman wanted his wife killed, but he did not think she would ever actually be harmed. He considered notifying the police of the possibility that she might be harmed, but he did not do it. The defendant denied Moore told him his plan was to go ask Carol Hamman to show him the house and then kill her. He also denied he told Detective Cross that this was Moore's plan. He did not know how long he stood at the front door of the Garelli residence, where he ran after Moore struck Hamman. He never told Moore to stop hitting Hamman, nor did he try to keep him from hitting her. He did not know whether Moore's gun was loaded at the time of the attack on Hamman, and Moore did not fire the gun inside the house. The defendant denied he stood on Hamman's hands in order to get the rings off. He was not aware that Moore took anything else from the house. He thought Hamman was dead when he took the rings off her fingers. He never told the police about what happened until questioned by Detective Cross because he was afraid Moore would do something to him or a member of his family.

The defendant admitted he gave Cross a written statement which was a brief recounting of his earlier discussion with Detective Cross. He acknowledged he never told Cross about Moore pointing a gun at him before he took the rings, and he was never asked by Cross to elaborate on his statement. The defendant stated he did not feel he was on the defensive during questioning and, thus, felt no need to ex-

plain his behavior. The defendant testified he was not asked by Cross about the scam to get money from Lloyd Hamman, and he did not mention it in his oral statement to Cross. Cross only asked him whether he got half the money and he answered, "Yes."

In rebuttal, Detective Cross stated the defendant told him that the plan was for Moore to go to the house where Carol Hamman was staying, look at the house because it was for sale, and then ask her if he (the defendant) could also see the house, and then they would go in there and "take care of her." On cross-examination, Detective Cross stated that when he questioned the defendant, he had not spoken to Lloyd Hamman, but he was aware that as part of the plot to kill Carol Hamman there was an alleged hit man to be used. Cross could not recall what sequence of questions had elicited the information from the defendant as to his and Moore's plan to "take care of" Carol Hamman.

The court then told the jury the following: "Lloyd Hamman, a police informant, went to Moore's Meat Market on October 11, and had a conversation with Moore who made the following statements to Hamman." The court then read excerpts from an edited version of the taped conversation between Moore and Hamman. The jury found the defendant guilty of all offenses.

The defendant contends he was not proved guilty of the offenses beyond a reasonable doubt where there was no direct evidence linking him to the physical commission of the beating of Carol Hamman, nor was there sufficient evidence that he was guilty of these offenses under the theory of accountability. We disagree.

■ Relying on *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789, the Illinois Supreme Court in *People v. Collins* (1985), 106 Ill. 2d 237, 261, stated it was not the function of the reviewing court to retry the defendant when presented with a challenge to the sufficiency of the evidence. " '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *** [U]pon judicial review, *all of the evidence* is to be considered in the light most favorable to the prosecution.' (Emphasis in original.)" (*Collins*, 106 Ill. 2d at 261; *People v. Whitlock* (1988), 174 Ill. App. 3d 749, 763.) Any discrepancies or conflicts in the testimony affect only the weight to be accorded the testimony, and the determination of the credibility of the witnesses, the weight to be accorded their testimony, and the inferences to be drawn therefrom are matters entirely within the province of the trier of fact. (*People v. Lighthall*

(1988), 175 Ill. App. 3d 700, 708.) A reviewing court will not set aside a jury's verdict unless the evidence is so improbable or unreasonable or so palpably contrary to the verdict as to create a reasonable doubt of the defendant's guilt. *Lighthall*, 175 Ill. App. 3d at 708.

■ There was evidence here which, if believed by the jury, was sufficient to prove beyond a reasonable doubt that the defendant participated in the physical beating of Carol Hamman. The defendant admitted he removed rings from Hamman's fingers, and there was evidence of lacerations to and a fracture of Hamman's right index finger. Although the defendant testified Hamman was motionless when he came back to the bedroom from the area of the front door, and he believed she was dead when he removed the rings from her hand, Carol Hamman testified she came to while lying on the floor, saw two figures and felt yanking on her right hand and fingers. When she asked the men to stop hurting her, "they" kept beating her, and she passed out. Viewing Hamman's testimony concerning the beating in the light most favorable to the prosecution, any rational trier of fact could have found that the defendant participated in this second episode of the beating of Hamman.

●■ ■ The evidence was also sufficient to prove the defendant guilty of the offenses beyond a reasonable doubt under the theory of accountability. "A person is legally accountable for the conduct of another when *** [e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1987, ch. 38, par. 5—2(c).) To be accountable for the acts of another, one must have the specific intent before and during the commission of a crime to promote or facilitate the commission of the crime. (*People v. Wallace* (1981), 100 Ill. App. 3d 424; *People v. Bolden* (1978), 59 Ill. App. 3d 441.) The State's proof must establish beyond a reasonable doubt that whatever conduct facilitated the later offense was with the intent that such offense be committed. (*People v. Ware* (1980), 82 Ill. App. 3d 297.) Mere presence at the scene of a crime, even with knowledge that a crime has been committed, is not enough to prove accountability. (*People v. Perruquet* (1988), 173 Ill. App. 3d 1054, 1063.) Proof that a person was present at the commission of a crime without disapproving or opposing the crime may be considered, however, along with other circumstances, such as the fact the defendant later maintained a close affiliation with his or her companions (*People v. Grice* (1980), 87 Ill. App. 3d 718) and failed to report the crime (*People v. Bailey* (1985), 132 Ill. App. 3d 399; *People v. Watson* (1982),

106 Ill. App. 3d 315). A person's assistance prior to or during the commission of the crime which amounts to accountability can be inferred from conduct which occurs after the event. (*People v. Young* (1983), 116 Ill. App. 3d 984.) One may be held to aid or abet without actively participating in the overt act. *People v. Patterson* (1981), 102 Ill. App. 3d 844.

■ Even if the jury did not believe the defendant actively participated in the physical attack on Carol Hamman, there was evidence which, if believed by the jury, established beyond a reasonable doubt the defendant's accountability for the offenses against her.

Defendant argues the evidence shows he believed the plot to kill Carol Hamman for money was only a scam being perpetrated on Lloyd Hamman to get the money. Defendant's argument is belied, however, by his admission that he phoned Carol Hamman the Wednesday before the incident to warn her of the danger she was in. He testified he lost his nerve, however, and did not talk with her when she was called to the phone. If Moore's plan was indeed only a scam to get Lloyd Hamman's money, there was no need to warn Carol Hamman of a nonexistent danger. The defendant's call to Hamman was placed the day *before* Moore announced his plan to tell Lloyd Hamman the hit man had been killed. Thus, at the time the defendant phoned Carol Hamman, there was no reason for him to believe she was in danger from any source hired by Lloyd Hamman other than William Moore.

Defendant testified he justified taking half the downpayment for the murder for his help in keeping the scam going with Lloyd Hamman, yet he admitted he had no dealings with Lloyd Hamman. Why would Moore give the defendant half the money for doing virtually nothing and then have to borrow back $2,800 from him to buy a car? The defendant also testified it was his understanding when he entered the Garelli residence on October 4 that he and Moore were going to get information on the layout of the house to substantiate the story of the hit man and make it believable to Lloyd Hamman. Defendant was aware at that point, however, that Moore had already been in the house the night before. Further, he was also aware at that time that it was Moore's plan to tell Lloyd Hamman the hit man had been killed on another job. Thus, his presence in the house was unnecessary for the expressed purpose.

After being reminded that he received "$6,500 [*sic*]," the defendant exited Moore's car and accompanied him to the front door, where Moore introduced him as his partner who was also looking for a house. Defendant thereby facilitated Moore's entry into the Garelli

residence. When Moore struck Hamman, the defendant did not tell him to stop, try to prevent him from striking her, or render her aid in any manner. He ran to the front door, where he could have escaped, yet he returned to the master bedroom at Moore's call. Defendant's continued presence without opposition when he could have departed or sought aid from others tends to prove his accountability. (*People v. Calvillo* (1988), 170 Ill. App. 3d 1070, 1077.) Although he testified he took Hamman's rings at gunpoint and that his subsequent acts at O'Donovan's and his failure to report the crime were also motivated by fear of Moore, his return to the area of the master bedroom where the crime occurred was not similarly compelled and, thus, must be viewed as a voluntary response to Moore's call for assistance. Despite his argument he was unaware of Moore's intention to kill Carol Hamman before they arrived at the house, once there and aware of Moore's illegal acts, the defendant's acts in furtherance thereof were enough to render him legally accountable for Moore's conduct. *People v. Church* (1981), 102 Ill. App. 3d 155, 167.

We conclude the State's evidence was sufficient to prove defendant guilty of the offenses beyond a reasonable doubt, and no reversal is warranted.

The defendant contends it was error for the court to read to the jury the edited version of the taped conversation between William Moore and Lloyd Hamman which occurred after the October 4 attack on Carol Hamman. Lloyd Hamman was wired for recording and was acting as a police informant during the conversation with Moore. The court agreed to allow into evidence those parts of the conversation which tended to confirm that Moore was lying to Hamman about the hit man. Defendant argued at trial that the complete conversation was admissible as a statement against penal interest and was relevant because it demonstrated that Moore was the main perpetrator, that he had the gun and that he used it to batter Carol Hamman. The State contends the court did not abuse its discretion in denying admission of the entire transcript and, assuming *arguendo* it was error to edit the transcript, such error was harmless.

■ We agree the court did not abuse its discretion in denying admission of the entire transcript. Generally, an extrajudicial declaration not under oath by a declarant that he, and not the defendant on trial, committed the crime charged is inadmissible as hearsay even though the declaration is against the declarant's penal interest. (*People v. Tate* (1981), 87 Ill. 2d 134, 143.) Such declarations may be admitted where justice requires. (*People v. Lettrich* (1952), 413 Ill. 172, 178.) Such a declaration also may be admissible under the statement-

against-penal-interest exception to the hearsay rule where there are sufficient indicia of trustworthiness of such extrajudicial statements. *People v. Carter* (1988), 174 Ill. App. 3d 369.

■ For example, in *Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038, in holding such a declaration admissible, the court considered as indicia of trustworthiness that (1) the statement was made spontaneously to a close acquaintance shortly after the crime occurred; (2) the statement was corroborated by other evidence; (3) the statement was self-incriminatory and against the declarant's interest; and (4) there was adequate opportunity for cross-examination of the declarant. The indicia of trustworthiness found in *Chambers* are not to be regarded as requirements of admissibility, however. *(People v. Bowel* (1986), 111 Ill. 2d 58, 67.) "The question to be considered in judging the admissibility of a declaration of this character is whether the declaration was made under circumstances that provide 'considerable assurance' of its reliability by objective indicia of trustworthiness. [Citations.] *** 'The admission of evidence is within the sound discretion of the trial court, and its ruling should not be reversed absent a clear showing of abuse of that discretion.' " *Bowel*, 111 Ill. 2d at 67-68, quoting *People v. Ward* (1984), 101 Ill. 2d 443, 455-56; *People v. Kokoraleis* (1986), 149 Ill. App. 3d 1000, 1018.

■ The declaration at bar was not made under circumstances which provide "considerable assurance" of its reliability. Hamman's motivation during the conversation was that of a police informant bent on securing evidence incriminatory of Moore. Moore's motivation in the conversation was to absolve himself of blame for the botched murder because he was not "the pro," to continue the deception about the pro with Hamman by explaining the pro was killed and Hamman's money could not be returned, and to assure Hamman that he was ready and willing to complete the job using a more efficient means, if necessary.

As the court noted at trial, Moore's taped statements did not inculpate the defendant, but neither did they exculpate him. It is clear in the statement that someone helped Moore, and Moore's response to Hamman's question as to who this helper was was shown as being "Inaudible." Further, the court noted that references to "the gun" did not exclude the possibility that defendant had a gun as well. Moore indicated several times during the conversation that he would have used a gun, but could not because there were "too many *** people there." Hamman inquired, "You had the gun with you?" and Moore responded, "Goddamn right." Hamman then asked Moore directly, "Oh, you're the one that laid her—the back of her head open

with the gun bit?" but Moore's response was shown in the transcript as "Inaudible." Accordingly, the statement was not exculpatory of the defendant's participation in the offense since it leaves open the possibility that he also may have had a gun and hit Carol Hamman. Finally, the declarant, Moore, was unavailable for cross-examination.

In light of the above, we see no abuse of the court's discretion in limiting the extent of its admission of Moore's extrajudicial statements. *People v. Kokoraleis* (1986), 149 Ill. App. 3d 1000, relied on by the defendant, is distinguishable. The defendant's conviction there for rape was reversed where the State failed to present evidence independent of the defendant's confession. In light of *Bowel*, we found the trial court had applied too stringent a test for the admissibility of statements made by the defendant's brother, Andy, and William Spreitzer, both of whom were implicated in the crime in the defendant's confession. Neither Andy nor Spreitzer mentioned the defendant in the course of their respective confessions. The trial court had denied admission of the confessions since it found they did not meet " 'all four requirements for admissibility as against penal interest' ennunciated in *Chambers*." (*Kokoraleis*, 149 Ill. App. 3d at 1019.) Under the *Bowel* test for admissibility, we found Andy's and Spreitzer's statements trustworthy where they were made to a State's Attorney and police officers while both defendants were in custody, and they must have been aware that disclosure would lead to criminal prosecution; certain physical and testimonial evidence corroborated Andy's and Spreitzer's statements; the statements were incriminatory when made; the State's prosecution of the defendant was grounded virtually exclusively on the defendant's confession, which he contended was involuntary and which was at variance with numerous facts in the record; and the defendant did not induce Andy's or Spreitzer's confession. In light of the trustworthiness of the statements, we found it was not harmless error beyond a reasonable doubt for the trial court to exclude them where the State's case rested on the defendant's confession.

We conclude the court did not err here in admitting the edited version of the transcript of the conversation between Lloyd Hamman and William Moore.

The defendant next contends it was reversible error for the court to refuse his five tendered instructions on the affirmative defense of compulsion. (Illinois Pattern Jury Instructions, Criminal, Nos. 24—25.21 (definition of compulsion), 24—25.21A (additional proposition to be proved to sustain the charges of armed robbery, attempted murder, armed violence and aggravated battery) (2d ed. 1981).) He argues he

was entitled to have the jury instructed on this affirmative defense where he presented sufficient evidence that he (1) acted under the threat or menace of imminent infliction of death or great bodily harm and (2) his belief in the imminence of great bodily harm or death was reasonable. See Ill. Rev. Stat. 1987, ch. 38, par. 7—11(a).

▪ The State contends that the record is totally devoid of any evidence of compulsion as to the offenses of attempted murder, armed violence and aggravated battery. The defendant himself testified he was unaware that any of these offenses were going to take place, that it was Moore, and not he, who beat Carol Hamman, and that he ran to the front door of the residence when Hamman fell to the floor. The defense of compulsion is a defense only with respect to the conduct demanded by the compeller. (*People v. Rodriguez* (1975), 30 Ill. App. 3d 118.) Accordingly, the trial court's refusal to include as an element of the State's proof as to those offenses that the defendant did not act under compulsion is affirmed.

●▪ As to the offense of armed robbery, the defendant testified he returned to the bedroom from the front door of the residence where he had fled when Moore began screaming to him. When Moore saw him, he pointed a gun at him and demanded that he remove Hamman's rings. Defendant also notes Moore later verbally threatened him and his family if he did not keep quiet about what had happened to Hamman. The defendant was not charged with any crime as a result of his keeping silent about the offense against Hamman, however, and Moore's threats subsequent to the commission of the armed robbery clearly cannot be viewed as evidence raising the defense of compulsion to it. A threat of future injury is not enough to raise the defense of compulsion. (See *People v. Carini* (1986), 151 Ill. App. 3d 264, 281-83; *People ex rel. Rusch v. Rivlin* (1934), 277 Ill. App. 183.) The threat must be of *imminent* death or great bodily harm.

That aside, the defendant argues Moore's pointing of the gun at him was evidence Moore threatened him with great bodily harm. He argues further his belief that Moore's threats were not idle ones was reasonable in that he had just witnessed Moore, whose motive was money, beat Hamman into unconsciousness and leave her for dead. Defendant contends Moore had an even stronger motive to maim or kill him or members of his family and he had reason to believe Moore would go to any length to silence him permanently. The State argues the defense of compulsion was not available to the defendant where the evidence shows it was his own negligence or fault which created the situation in which he contends he was compelled to commit a crime. That is, the defendant took $6,250 from Moore in connection

with the hit man scam on Lloyd Hamman, thus allowing Moore to use that fact against him in getting him to enter Hamman's residence. Also, although he had a clear opportunity to leave the house when he fled to the front door, he did not but, instead, returned to the bedroom where Moore was standing over Hamman's battered, motionless body.

The defense of compulsion generally requires an impending threat of great bodily harm together with a demand that the person perform a specific criminal act for which he eventually is charged. (Ill. Rev. Stat. 1987, ch. 38, par. 7—11(a); *People v. Blake* (1988), 168 Ill. App. 3d 581, 586.) It is an affirmative defense on which the defendant must present "some evidence" in order to raise it and which, if raised, must be disproved beyond a reasonable doubt by the State. Ill. Rev. Stat. 1987, ch. 38, pars. 7—14, 3—2; *People v. Calvillo* (1988), 170 Ill. App. 3d 1070, 1078.

In determining whether an instruction on the defense of compulsion is necessary, the reviewing court is not authorized to weigh the evidence upon a question of whether or not compulsion is shown, but must determine whether or not the issue was sufficiently raised to justify such an instruction. *People v. Adcock* (1975), 29 Ill. App. 3d 917.

As noted, the defendant must present "some evidence" to raise the issue. (Ill. Rev. Stat. 1987, ch. 38, par. 3—2.) That quantum of evidence has been described as evidence sufficient to raise an issue of fact for the jury, creating a reasonable doubt as to the defendant's guilt. (*People v. Redmond* (1974), 59 Ill. 2d 328, 337-38; *People v. White* (1979), 78 Ill. App. 3d 979, 981; see also *People v. Creach* (1979), 69 Ill. App. 3d 874, 896-97, 904 (Linn, J., dissenting).) Unless the evidence before the trial court is so clear and convincing as to permit the court to find as a matter of law there is no affirmative defense, the factual issue must be determined by the jury with proper instruction as to the law applicable. *People v. Carpentier* (1974), 20 Ill. App. 3d 1024, 1026-27.

The trial court properly refused the defendant's tendered compulsion instructions. There was clear evidence the defendant had an ample opportunity to withdraw from the criminal activity when he fled to the front door of the residence after Moore struck Hamman. He had not been threatened up to that point by Moore and, in fact, he was out of Moore's view. There was no evidence Moore compelled him by threat of violence to return to the bedroom. Defendant testified that "for some reason" he returned to the bedroom when Moore called him. The defense of compulsion is not available to one who

passes up an opportunity to withdraw from the criminal enterprise. (*People v. Colone* (1978), 56 Ill. App. 3d 1018.) Evidence of the defendant's opportunity here to withdraw distinguishes the instant cause from *People v. Adcock* (1975), 29 Ill. App. 3d 917, and *People v. Pegram* (1987), 152 Ill. App. 3d 656, cited by the defendant, wherein each court found it was error to refuse to instruct the jury on the affirmative defense of compulsion where the defendant had presented sufficient evidence to warrant the giving of the instruction. Neither the *Adcock* nor *Pegram* defendant had the clear opportunity to withdraw from the criminal enterprise that the defendant here did.

We conclude it was not reversible error for the court to refuse defendant's compulsion instructions.

Defendant's final contentions are (1) that his armed violence conviction must be vacated because his conviction for that offense and for the offense of attempted murder was based on the same physical act—hitting Carol Hamman on the head—and (2) because the verdicts are legally inconsistent in that the attempted murder offense required a specific intent whereas armed violence only required that the act be performed knowingly.

The defendant did not raise these contentions at trial. Such contentions have been treated as plain error, however, in appeals from denials of post-conviction petitions (*People v. Cox* (1972), 53 Ill. 2d 101; *People v. Jacobs* (1987), 154 Ill. App. 3d 211) and in direct appeals (*People v. Baity* (1984), 125 Ill. App. 3d 50). Accordingly, we will consider the merits of the defendant's contentions.

In support of his "single act" contention, the defendant cites *People v. King* (1977), 66 Ill. 2d 551, *People v. Myers* (1981), 85 Ill. 2d 281, and *People v. Baity* (1984), 125 Ill. App. 3d 50. The one act/one crime principles discussed in *People v. Cox* (1972), 53 Ill. 2d 101, and its progeny, including, *inter alia*, *King* and *Myers*, were recently reevaluated and reaffirmed in *People v. Segara* (1988), 126 Ill. 2d 70.

In *King*, the court found there were "no constitutional limitations against multiple convictions and concurrent sentences for different offenses arising from multiple acts which are incidental to or motivated by some greater criminal objective." (*King*, 66 Ill. 2d at 565.) "Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are, by definition, lesser included offenses. *** 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense." (66 Ill. 2d at 566.) By definition, an included offense means an offense which "[i]s established by proof of the same or less than all of the facts or a less culpable mental state

(or both), than that which is required to establish the commission of the offense charged." (Ill. Rev. Stat. 1987, ch. 38, par. 2—9.) Stated otherwise, a "lesser included offense" is one composed of some, but not all of the elements of the greater offense and which contains no element not included in the greater (*People v. Pumphrey* (1983), 115 Ill. App. 3d 1031) so that it is impossible to commit the greater offense without necessarily committing the lesser offense (*People v. Hefley* (1982), 109 Ill. App. 3d 74). Because armed violence requires a predicate felony, multiple convictions for armed violence and the predicate felony are improper where the same physical act is the basis for both charges. *People v. Donaldson* (1982), 91 Ill. 2d 164, 170.

The defendant incorrectly states that the court in *Myers* reversed the defendant's attempted murder conviction where he had contended that the attempted murder and armed violence offenses were based on the same physical act, the cutting of the victim's neck. On the contrary, the court upheld both convictions where the evidence showed the defendant cut the victim's throat, moved the knife to cut another victim's fingernail, and cut the first victim's throat again with even more force, thus establishing two separate acts, each capable of supporting a different offense. (*Myers*, 85 Ill. 2d at 288-89.) There was evidence in the instant cause that Moore, for whose conduct the defendant was accountable, struck Carol Hamman on the head with the butt of his gun until she fell to the floor, motionless. Hamman testified she came to, she saw two figures, could not move her left hand and her right hand was being yanked. She asked the men to stop hurting her. They continued to beat her, and she passed out again. There was no testimony as to whether the gun was used in connection with the second beating. She next remembered her head being jerked up and the sensation of being strangled with a rope or cord until she passed out again. There was medical evidence consistent with strangulation by hand but not a cord, however. Nonetheless, the evidence shows at least two separate acts of beating.

The measurable time interval between the beatings and the intervening event of the armed robbery of Carol Hamman—two factors to consider in deciding whether a defendant's conduct consisted of one or several physical acts (*People v. Williams* (1987), 161 Ill. App. 3d 613, 622)—distinguish the instant cause from *People v. Baity*, cited by the defendant. There, the court found the defendant's act of shooting his wife three times in rapid succession constituted part of the same physical act and would not support convictions for both armed violence and attempted murder, and the court vacated the defendant's armed violence conviction. *Baity*, 125 Ill. App. 3d 50.

We conclude the defendant's armed violence conviction need not be vacated on the basis it was based on the same act as his attempted murder conviction.

■■ ■ We also do not find meritorious the defendant's contention the verdicts are legally inconsistent. Legally inconsistent verdicts exist when a verdict of guilty is premised on the existence of an element of the offense and a verdict of not guilty is premised on the nonexistence of that same element. (*People v. Frias* (1983), 99 Ill. 2d 193, 198; *People v. Ortiz* (1987), 156 Ill. App. 3d 170, 176.) In *People v. Spears* (1986), 112 Ill. 2d 396, upon which defendant relies, the court found a defendant's act of shooting at his estranged wife three times could not have been committed with the legally inconsistent mental states of intent and knowledge and recklessness, even assuming *arguendo* the shots were separable acts. As pointed out in *People v. Moritz* (1988), 173 Ill. App. 3d 498, however, the conflict in *Spears* was only between the mental states of intent and knowledge on the one hand, and recklessness on the other. There was no conflict for the jury in *Spears* to find the defendant acting with knowledge *and* with intent. (*Moritz*, 173 Ill. App. 3d at 501-02.) *People v. Kraft* (1985), 133 Ill. App. 3d 294, cited by the defendant in reply, does not warrant a contrary finding here where there were at least two separable acts. In *Kraft*, the court discussed the four distinct culpable mental states of intent, knowledge, recklessness, and negligence, "with knowledge encompassing a distinct and less purposeful state of mind than intent." (*Kraft*, 133 Ill. App. 3d at 302.) At issue in *Kraft* was whether the jury was improperly instructed on the offense of attempted murder. The court found it was improperly instructed in that the instruction would have allowed the jury to find the defendant guilty of attempted murder if it found he *either* intended to kill that individual *or* knew that such acts would cause the death of that individual *or* knew that such acts created a strong probability of death of that individual. The offense of attempt, however, requires an *intent* to commit the offense, *not* merely the *knowledge* that the acts will cause death or create a strong probability of death. There is no contention of erroneous instruction here, and the record reveals no erroneous instructions. The jury's verdicts of guilty of attempted murder and armed violence were not legally inconsistent.

The judgment of the circuit court of Du Page County is affirmed.

Affirmed.

INGLIS and DUNN, JJ., concur.