**FIRST DIVISION**
November 17, 2008

No. 1-06-1190

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 02  CR 31770 |
| | ) | |
| DEMETRIUS JOHNS, | ) | The Honorable |
| | ) | Reginald Baker, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE GARCIA delivered the opinion of the court.

Following a jury trial, Demetrius Johns was found accountable for armed robbery but not for murder.  He was given an 11-year sentence with an "add-on" penalty of 15 years because the armed robbery was committed with a handgun.  On appeal, the defendant contends (1) his trial counsel was ineffective for failing to assert a compulsion defense, (2) the add-on portion of his sentence violates the "prohibition against disproportionate penalties," and (3) his nonenhanced sentence of 11 years is an abuse of discretion because a principal codefendant was sentenced to six years for armed robbery.

We affirm: a compulsion defense was unavailable to the defendant as a matter of law.  We therefore reject his ineffective assistance claim.  We agree, however, that imposing an add-on penalty of 15 years violated the proportionate

penalties clause of the Illinois Constitution on the authority of People v. Hauschild, 226 Ill. 2d 63, 86-87, 871 N.E.2d 1 (2007). Because we vacate his sentence in its entirety and remand for a new sentencing hearing, we do not reach the third issue.

## BACKGROUND

The victim, Eugene Williams, was killed on May 5, 2002, at the Knights' Inn in Harvey. The defendant was arrested nine days later. After his arrest, the defendant made statements implicating himself, Larry Melvin, and Michael Powe[1] in the victim's death. The defendant was charged in a 10-count indictment under an accountability theory. The case proceeded to trial in March 2006 before a jury on three counts of murder (intent to kill, strong probability of death and felony murder) and one count of armed robbery.

At trial, the State presented the testimony of Dolores Bibbs, a housekeeper at the Knights' Inn. On May 5, 2002, Bibbs went to the victim's room to get her boyfriend. When she entered the room, her boyfriend was smoking and drinking with the victim, the defendant, Powe, and Melvin. Bibbs and her boyfriend left the room and Bibbs began her housekeeping duties. While she was cleaning, another housekeeper screamed for Bibbs to come to the

---

[1] Sometimes spelled "Poe" in the trial transcripts.

victim's room. When Bibbs got to the victim's room, the victim was kneeling in the doorway covered in blood. Bibbs stayed with the victim until the paramedics arrived.

Quiara Campbell testified she was at the Knights' Inn watching television with her sister's children when she heard a door slam. She got up to look out the window and saw three men running out of the room next door. Campbell recognized the defendant, Melvin, and Powe as the three men, all of whom had blood on their white T-shirts. The men ran down a flight of stairs to the parking lot and drove away in a car driven by the defendant. Campbell returned to watching television. After a few minutes, there was a knock on the door. Campbell's nephew opened the door to reveal the victim, who was covered in blood. Campbell jumped up, closed the door, and called the police.

Detective William Martin of the Harvey police department first spoke to the defendant on the evening of May 14, 2002. After indicating he understood his <u>Miranda</u> rights, the defendant agreed to speak with Martin. Detective Boone joined the interview. The defendant initially told Martin he knew nothing about the victim's death. After Martin shared information gathered during the investigation, the defendant admitted he was at the Knights' Inn when the victim was killed.

Martin asked the defendant to provide a written statement

detailing his version of what occurred, which the defendant agreed to do. After reviewing the handwritten statement with the defendant, Martin had the statement typed and he reviewed the typed statement with the defendant. Then Martin, along with Boone, and the defendant signed each page of the typed statement.

During cross-examination, Martin testified that the defendant claimed he "wasn't with the plan to kill" the victim, never touched the victim, and never had a gun.

After Martin's testimony, the defendant's typed statement was read into the record. In the statement, the defendant admitted he was driving his car on May 5, 2002, when he saw Melvin and Powe walking and picked them up. The defendant drove Melvin and Powe to another location "so [Melvin] could serve a customer." When the three men were back in the car, Melvin told the defendant about a "lick," meaning a robbery, he wanted to do at the Knights' Inn.

Melvin told the defendant that he and Powe had planned to commit the robbery the previous night, but could not because they did not have a car. Melvin, who had robbed the victim before, described the victim as "sweet," meaning he would not fight back during the robbery. Melvin indicated he planned to kill the victim after the robbery. The defendant said he was not going to

**4**

the Knights' Inn if the victim was going to be killed and asked why the victim had to be killed if he was sweet. Melvin agreed not to kill the victim.

When the three men arrived at the Knights' Inn, they saw people coming out of the victim's room. The defendant tried to signal to Melvin and Powe to call off the robbery because too many people were around.

The defendant, Melvin, and Powe proceeded to the victim's room. After a while, Powe went to the bathroom. When he came out of the bathroom, he had a gun. Powe pointed the gun at the victim and told him to get on the ground. Once the victim was on the floor, Melvin used duct tape to bind the victim's legs and hands. Powe demanded the victim reveal where his money and drugs were located. The victim complied.

After Powe and Melvin obtained the victim's money and drugs, Melvin began dragging the victim toward the bathroom. At this point, the defendant said he was leaving. Powe told the defendant to stay. Melvin took a razor off the bureau, handed it to Powe, and told Powe to cut the victim's throat. Powe handed the razor back, telling Melvin to do it. Once Melvin and the victim were in the bathroom, Powe paced between the two rooms.

The defendant heard a gunshot but could not see who fired the gun from where he was seated. After the gunshot, the

defendant got up and ran out of the room. Melvin and Powe followed. The three men got into the defendant's car and the defendant drove away. The defendant drove Melvin and Powe to several locations before dropping them off.

Assistant State's Attorney Shawn Concannon testified she met the defendant at the Harvey police station. She introduced herself as an attorney, explained she was not the defendant's attorney, and read the defendant his Miranda rights. Concannon testified the defendant said he understood his rights and agreed to speak with her about the victim's death. After their conversation, Concannon offered the defendant several ways to memorialize his statement. The defendant chose to make a videotaped statement.

After Concannon's testimony, the defendant's videotaped statement, which was substantially similar to his written statement, was played in open court. The State rested.

The trial court denied the defendant's motion for a directed verdict.

The defendant took the stand. The defendant testified that when he learned that Melvin wanted to kill the victim after the robbery, the defendant said he "wasn't with that." The defendant told Melvin " 'if you steady talking about killing this guy, I'm not with it.' " Based on Melvin's response that he would not

kill the victim, the defendant testified he believed the robbery was called off as well and that the men were going to the Knights' Inn to watch a basketball game on television.

When the three men arrived at the Knights' Inn, the victim and several other people were on a balcony overlooking the parking lot. The defendant looked at Melvin and Powe and "[it] was basically like, 'Man, I'm not in this. I ain't with this. Look at these people.' " Powe nodded his head, which the defendant took as agreeing with him. Melvin did not respond.

The defendant, Powe, and Melvin proceeded to the victim's room. The defendant sat in a chair against the back wall of the room. After 45 minutes of watching television, Powe went to the bathroom. He came out with a gun. The defendant stood up and asked Powe twice, "Man, what is you doing?" Powe pointed the gun at him and told him to shut up and sit down. The defendant complied, because Powe scared him with the gun.

While seated, the defendant watched as Melvin removed cash from the victim's pocket after Powe asked the victim where the money was. While he remained seated, the defendant saw Powe remove drugs from a drawer. Melvin then bound the victim with duct tape, took a razor off the television stand, and dragged the victim into the bathroom.

Once the victim was in the bathroom, the defendant stood up

**7**

and said he was leaving because he "wasn't on this, and they were doing it anyway." Powe again pointed the gun at the defendant and told him to sit down and shut up because he was driving. The defendant believed that if he tried to leave the victim's room, Melvin and Powe might "shoot and kill" him.

When the defendant heard a gunshot, he got up and ran out of the room. Powe and Melvin followed. The three men got into the defendant's car and the defendant drove away. The victim had been shot and had his throat slit.

After leaving the Knights' Inn, the defendant drove Melvin and Powe to several locations before dropping them off at Powe's mother's home. The defense rested after the defendant's testimony.

In her closing statement, defense counsel argued that the defendant should not be held accountable for Melvin and Powe's actions because the defendant terminated his role in the robbery when he arrived at the Knights' Inn and signaled to Melvin and Powe that the robbery could not go forward with so many people around. The jury was instructed on the defendant's claim of withdrawal. Illinois Pattern Jury Instructions, Criminal, No. 5.04 (4th ed. 2000) (IPI Criminal 4th No. 5.04).

The jury found the defendant not guilty of murder but guilty of armed robbery.

After denying the defendant's motion for a new trial, the trial court sentenced the defendant to a total of 26 years, 15 of which constituted the add-on penalty based on the use of a firearm. The trial court denied the defendant's motion to reconsider the sentence. This timely appeal follows.

ANALYSIS

The defendant raises three issues on appeal. First, he contends his trial counsel was ineffective because she failed to raise the affirmative defense of compulsion when evidence was presented at trial that "the defendant was forced at gunpoint to remain with [Melvin and Powe] as they committed an armed robbery." Next, the defendant claims his enhanced sentence for armed robbery based on the use of a firearm during the offense violates the Illinois Constitution's prohibition against disproportionate penalties because armed robbery committed with a firearm has a more severe penalty than armed violence predicated on a robbery although the two offenses have the same statutory elements. Finally, the defendant contends the trial court abused its discretion when it sentenced him to 11 years for armed robbery, without the add-on penalty, when Melvin, who the defendant contends had a direct role, was given six years for the same offense.

I. Ineffective Assistance of Counsel

**9**

According to the defendant's main brief, the defendant's ineffective assistance of counsel claim is founded on his testimony "that he tried to stop codefendant Michael Powe from robbing Eugene Williams and when [the defendant] tried to leave the scene, Michael Powe, while holding a gun, told [the defendant] to 'shut up and sit down' because he [the defendant] was driving and that [the defendant] felt too scared to leave." This evidence, according to the defendant, was sufficient to "raise a compulsion defense and [defense counsel should have requested] that the jury be instructed accordingly." If in fact the evidence at trial was sufficient to raise the affirmative defense of compulsion, then trial counsel's failure to recognize the availability of that defense would constitute ineffective assistance of counsel. See People v. Sims, 374 Ill. App. 3d 231, 869 N.E.2d 1115 (2007).

Where the State's evidence does not raise the issue of an affirmative defense, the defendant need only "present some evidence thereon" to enlarge the State's burden of proving beyond a reasonable doubt the offense charged to overcoming the evidence supporting the elements of the affirmative defense as well. 720 ILCS 5/3-2 (West 2002); People v. Pegram, 124 Ill. 2d 166, 173, 529 N.E.2d 506 (1988), quoting Ill. Rev. Stat. 1983, ch. 38, pars. 3-2(a),(b) (testimony elicited from the defendant

**10**

"certainly satisfied the requirement that a defendant, to raise an affirmative defense, 'must present some evidence thereon' "); People v. Adcock, 29 Ill. App. 3d 917, 331 N.E.2d 573 (1975) (evidence sufficient to require instruction on compulsion, which the State must disprove beyond a reasonable doubt).

Thus, the question before us is whether the defendant presented some evidence to support the defense of compulsion. See People v. Kucavik, 367 Ill. App. 3d 176, 179, 854 N.E.2d 255 (2006) ("even slight evidence" sufficient to mandate instructing on affirmative defense). In the context of this case, we examine the defendant's testimony as to his involvement in the armed robbery to determine whether it "raise[s] an issue of fact for the jury creating a reasonable doubt as to defendant's guilt." Sims, 374 Ill. App. 3d at 268, citing People v. Redmond, 59 Ill. 2d 328, 320 N.E.2d 321 (1974) (quantum of evidence necessary to raise an affirmative defense is sufficient evidence to raise an issue of fact for the jury creating a reasonable doubt as to the defendant's guilt).

On the record before us, we conclude the affirmative defense of compulsion is foreclosed to the defendant for three reasons. First, our examination of the record finds it devoid of any evidence that the defendant performed any conduct under compulsion that amounted to armed robbery. Second, the

**11**

defendant's testimony at trial amounts to no more than a claim that he was unaware that the robbery would take place. Finally, the defendant had ample opportunity to withdraw from the criminal enterprise to commit robbery but he failed to withdraw.

### A. No Evidence of Compelled Conduct

The defendant claims that his trial testimony that he tried to stop the commission of the armed robbery, for which he was found accountable, should have alerted defense counsel of the availability of the defense of compulsion. We take the defendant's claim that he attempted to "stop" the armed robbery to be founded on his testimony that when Powe exited the bathroom with a gun in hand and announced the robbery, the defendant stood up and stated twice, "Man, what is you doing?" According to the defendant, Powe then pointed the gun at him and told him to shut up and sit down, and he complied.

We find the defendant's claim that he attempted to stop the armed robbery to be wholly at odds with his claim that it was this same conduct that formed his accountablility for armed robbery. We fail to understand how conduct aimed at stopping the armed robbery can also serve as conduct amounting to the commission of armed robbery. The defendant's generous interpretation of his trial testimony that he attempted to stop the armed robbery but was foiled by Powe is not "some evidence"

**12**

of a plausible compulsion defense. While it is true that the defendant testified that he remained seated during the armed robbery "under the compulsion of threat or menace of imminent infliction of death or great bodily harm" (720 ILCS 5/7-11 (West 2002)), this is not the conduct that formed the basis for his armed robbery conviction. "The defense of compulsion is a defense only with respect to the conduct demanded by the compeller." People v. Scherzer, 179 Ill. App. 3d 624, 644 (1989), citing People v. Rodriguez, 30 Ill. App. 3d 118, 332 N.E.2d 194 (1975).

Clearly, if the jury believed the defendant had attempted to stop the armed robbery but was foiled by Powe and his handgun, the jury should have found him not guilty of armed robbery, as his mere presence was insufficient to hold him accountable for the actions of Powe and Melvin. See People v. Perez, 189 Ill. 2d 254, 268, 725 N.E.2d 1258 (2000) ("presence at the commission of the crime, even when joined with flight from the crime or knowledge of its commission, is not sufficient to establish accountability"). Yet, the defendant makes no argument on appeal that the jury issued its verdict against the evidence presented. The videotape and the defendant's written statement introduced at trial explain his failure to so argue and provide the basis for the jury's verdict. Scherzer, 179 Ill. App. 3d at 645.

**13**

1-06-1190

The defendant was found accountable not based on his failed effort to "stop" the armed robbery or his decision to follow Powe's command that he shut up and remain seated. Rather, the defendant was found accountable based on the aid he provided before, during and after the three arrived at the Knights' Inn with the shared intent to commit a robbery. Both the videotape and his written statement made clear that the defendant joined in the criminal purpose of going to Knights' Inn to commit a "lick." The videotape and written statement made clear that the defendant drove to the Knights' Inn with Powe and Melvin with the intention of committing a robbery, proceeded with Powe and Melvin to the victim's room, remained with them while they searched and recovered the victim's drugs and money, only announced he was leaving after the victim was dragged to the bathroom and a shot was fired, and drove Powe and Melvin away from the scene of the murder. The evidence is overwhelming that the defendant aided Powe and Melvin in the planning and commission of the offense. The jury's verdict is confirmed by the defendant's own testimony that Melvin and Powe were unable to commit the robbery the day before because they lacked transportation. The defendant provided the missing transportation. There is no evidence that he committed any of the acts in furtherance of the criminal enterprise under a threat or menace of imminent death of great

**14**

bodily harm.[2]  See <u>People v. Scherzer</u>, 179 Ill. App. 3d 624, 644, 534 N.E.2d 1043 (1989) (no error in refusal to instruct on defense of compulsion "as to those offenses that the defendant did not act under compulsion").

The defendant's testimony that he was compelled to shut up and sit down was not "some evidence" that he committed armed robbery under compulsion.  The affirmative defense of compulsion was foreclosed to the defendant because the conduct that he was compelled to perform, according to his testimony, can in no way be connected to the commission of the offense of armed robbery. <u>Scherzer</u>, 179 Ill. App. 3d at 645-46.  There is no evidence that the defendant committed armed robbery under the threat or menace of imminent death or great bodily harm.  In fact, based on the defendant's testimony, which is the only evidence offered in support of a compulsion defense, he did not perform any conduct under compulsion other than to remain seated while the armed

---

[2] Consistent with the jury's finding of not guilty of murder, the defendant also made clear in the videotape and written statement that he would not take Powe and Melvin to the Knights' Inn if, along with the robbery, Melvin intended to kill the victim.

robbery took place in front of him.

### B. Unaware of Impending Armed Robbery

The evidence is unchallenged that the defendant played no direct role in the removal of the cash from the victim's pockets or the drugs from the drawers. He testified that he believed the assurances Melvin gave while en route to the Knights' Inn that he would not kill the victim also meant the robbery was off as well. The defendant also testified that if he was mistaken that the robbery was not called off in the car, the robbery was certainly off when he remarked to Powe and Melvin upon arriving at the Knights' Inn that there were too many individuals around.

However, once again the defendant's claims are at odds with each other. If the robbery was called off at the same time Melvin gave assurances that the killing would not go forward, there would have been no reason for the defendant to express concern upon arriving at the Knights' Inn over the number of persons around if the three were there simply to watch television with the victim, as the defendant contended at trial. While we understand the defendant to say, in the end, Melvin lied to him about both the robbery and the killing, the jury had good reason to reject the defendant's claim that he believed that the robbery was off either before or upon arriving at the Knights' Inn. The incriminating evidence in the videotape and the written statement

**16**

gave the jury ample evidence to conclude that at the time the three defendants arrived at the Knights' Inn, the plan to commit the robbery was very much in play. There was ample evidence that the robbery would go forward if the opportunity arose. When the opportunity to commit the robbery presented itself with the three defendants being alone with the victim, Powe acted. While the defendant, according to his trial testimony, sat through the commission of the armed robbery, based on the evidence, the jury had ample evidence to find the defendant accountable for that offense.

A generous reading of the defendant's testimony is that at most he was unaware that the robbery would take place. This is precisely the import of the defendant's claim when he points to his testimony that he believed the robbery had been called off, first in the car and then at the Knights' Inn, that he twice questioned Powe what he was doing when he exited the bathroom with a gun in hand, and that he played no role in the removal of the cash from the victim's pockets or the drugs from the drawers. That the defendant was unaware that the robbery would take place forecloses the defense of compulsion. Scherzer, 179 Ill. App. 3d at 644 (no reversible error in refusing the defendant's instructions on the affirmative defense of compulsion where the defendant testified he was unaware the offenses were going to

**17**

take place).

### C. No Withdrawal

In the nature of an alternative argument, the defendant contends he had a change of mind, amounting to withdrawal, regarding the robbery when he observed too many individuals around upon arriving at the Knights' Inn.  Perhaps the defendant did have a change of mind, but he did not withdraw at that point.  Nor did Powe and Melvin share, as it turns out, the defendant's claimed change of mind.

The defendant went along with Powe and Melvin to the victim's room.  The only explanation for going to the victim's room offered in the videotape and written statement was to commit a robbery.  In proceeding to the victim's room with Powe and Melvin, we find no evidence that the defendant withdrew from the original intention to commit a robbery that first brought the three defendants to the Knights' Inn.  See People v. Rucheinski, 224 Ill. App. 3d 118, 125, 586 N.E.2d 506 (1991) (no evidence in record to entitle the defendant to instruct jury on withdrawal exception to accountability theory).

Thus, even if we were to find "some evidence" to support the defendant's claim of compulsion, under the facts of this case, a compulsion defense remained unavailable to the defendant.  A compulsion defense is not available "if the defendant had ample

**18**

opportunities to withdraw from the criminal enterprise but failed to do so." Sims, 374 Ill. App. 3d at 267, citing Scherzer, 179 Ill. App. 3d 624, 645-46. The defendant's claim that he believed the robbery was called off at the time they arrived at Knights' Inn was based on too many witnesses being present, not a withdrawal from the criminal enterprise the three had embarked upon. While the defendant understood Powe's nod to mean that he agreed that the robbery was off, he admitted he got no such assurances from Melvin, and it was Melvin that brought up the "lick" and his intention of killing the victim after the robbery. Of course, the nod from Powe turned out to mean nothing more than a need to wait for the victim to be alone with the three defendants to commit the robbery. Sometime after Dolores Bibbs and her boyfriend left the victim in the company of the defendant, Powe and Melvin, Powe acted on the original plan to rob the victim. The defendant had ample opportunity to withdraw from the planned robbery but failed to do so. More to the point, the jury was instructed on withdrawal and it was rejected.

Sims, the case the defendant heavily relies upon for his claim that his testimony was sufficient to raise a compulsion defense, is distinguishable on its facts. In Sims, we found ineffective assistance of counsel based on counsel's failure to raise the affirmative defense of compulsion and request the jury

**19**

be instructed accordingly in light of the evidence adduced at trial. Sims was found accountable for both the murder and the armed robbery committed at a restaurant. Sims, 374 Ill. App. 3d at 232. Sims was a 15-year-old, whose role in the robbery was to serve as a lookout. A codefendant, who pled guilty and was a witness for the State, testified on cross-examination that before all those involved in the robbery got into the car to drive to the restaurant, the "defendant stated that he did not want to take part in the robbery." Sims, 374 Ill. App. 3d at 235. The codefendant testified that the ringleader, with a gun in hand, "told defendant that 'he was there when it started, he got to be there when it finished.' " Sims, 374 Ill. App. 3d at 235. After this testimony was elicited, the trial court called a recess to inquire of defense counsel whether he "was attempting to raise an affirmative defense of compulsion without having pled it." Sims, 374 Ill. App. 3d at 235. Defense counsel conceded that he made a " 'mistake by not filing or asking to file a compulsion defense.' " Sims, 374 Ill. App. 3d at 235. When testimony resumed, the codefendant testified that none of the participants ever saw Sims carrying out his role of being a lookout. Sims, 374 Ill. App. 3d at 236. The defendant was arrested near the robbery site, about 30 to 40 feet away. Sims, 374 Ill. App. 3d at 236. The jury was never instructed on a compulsion defense.

**20**

No testimony similar to that presented in Sims was ever elicited in this case.

The other case cited by the defendant in support of his claim that defense counsel should have raised a compulsion defense is also distinguishable on its facts. See People v. Pegram, 124 Ill. 2d 166, 174, 529 N.E.2d 506 (1988). In Pegram, the supreme court concluded that the defendant's testimony that he was forced at gunpoint to lead the robbers to the victim, forced to place the victim in a locked room, lie on the floor and lead them to the victim's car, "certainly satisfied the requirement that a defendant, to raise an affirmative defense, 'must present some evidence thereon.' " Pegram, 124 Ill. 2d at 173, quoting 720 ILCS 5/3-2(a) (West 2002). No such force was ever exerted against the defendant here.

### D. Trial Counsel Not Ineffective

We find the record devoid of any evidence to support the defendant's claim that he aided and abetted the commission of armed robbery under compulsion. We find the defendant's testimony as to his involvement in the armed robbery amounts to no more than he was unaware that the armed robbery would be committed. The defendant's testimony fails to raise an issue of fact for the jury creating a reasonable doubt as to the defendant's guilt. In any event, the defendant was presented

**21**

with ample opportunity to withdraw from the plan to commit the robbery but he failed to do so. The evidence against compulsion was so clear and convincing that as a matter of law we conclude that there was no compulsion based on the defendant's testimony. See People v. Carpentier, 20 Ill. App. 3d 1024, 1027, 314 N.E.2d 647 (1974) (if evidence against affirmative defense is clear and convincing then, as a matter of law, jury need not be instructed on affirmative defense); People v. Dunlap, 315 Ill. App. 3d 1017, 1025, 734 N.E.2d 973 (2000) (no evidence in the record as to any of the necessary elements of self-defense). Consequently, the record is barren of any evidence that might call into question defense counsel's failure to assert a compulsion defense, which in turn means there is no evidentiary support for his claim of ineffective assistance of counsel. See People v. Moore, 356 Ill. App. 3d 117, 121, 824 N.E.2d 1162 (2005). On the contrary, the result counsel achieved for the defendant supports that she was very effective.

## II. The Defendant's Enhanced Sentence

The defendant contends his sentence with an add-on penalty violates the proportionate penalties clause of the Illinois Constitution because armed robbery with a firearm and armed violence predicated on robbery have identical statutory elements, yet armed robbery with a firearm is punished more severely. As

**22**

controlling authority, the defendant cites People v. Hauschild, 226 Ill. 2d 63, 86-87, 871 N.E.2d 1 (2007).  The defendant argues that under the authority of Hauschild, the add-on portion of 15 years of his 26-year sentence must be vacated, leaving him with an 11-year sentence.

The State agrees that Hauschild is controlling.  However, the State contends Hauschild requires this court to vacate the defendant's sentence in totality and remand the case to the trial court for a new sentencing hearing.

In Hauschild, our supreme court determined that under the identical elements test, the "sentence for armed robbery while armed with a firearm (720 ILCS 5/18-2(b) (West 2000)) violates the proportionate penalties clause because the penalty for that offense is more severe than the penalty for the identical offense of armed violence predicated on robbery with a category I or category II weapon (720 ILCS 5/33A-3(a), (a-5) (West 2000))." Hauschild, 226 Ill. 2d at 86-87.  In Hauschild, the defendant was not given the corresponding " 'add-on penalty' of 15 years" for armed robbery because the sentence was imposed "while [People v. Walden, 199 Ill. 2d 392, 769 N.E.2d 928 (2002),] was still good law, invalidating the enhanced penalty for armed robbery while armed with a firearm." Hauschild, 226 Ill. 2d at 88.  The supreme court in Hauschild established a bright line that "when

**23**

an amended sentencing statute has been found to violate the proportionate penalties clause, the proper remedy is to remand for resentencing in accordance with the statute as it existed prior to the amendment." Hauschild, 226 Ill. 2d at 88-89. A remand was ordered even though the 12-year sentence imposed was a proper one. Hauschild, 226 Ill. 2d at 89.

Thus, we vacate the defendant's sentence for armed robbery and remand this matter to the trial court for resentencing, "within the range for armed robbery as it existed prior to being amended by Public Act 91-404, eff. January 1, 2000." Hauschild, 226 Ill. 2d at 89.

### III. The Defendant's Sentence

In light of our remand, we do not address the defendant's final contention that the trial court abused its discretion when it imposed a sentence of 11 years for the nonenhanced portion of the defendant's sentence when Melvin was given a sentence of six years for the same offense.[3]

### CONCLUSION

---

[3] In fact, on the record before us, it appears the defendant and Melvin received identical aggregate sentences of 26 years. Melvin was sentenced to 20 years for murder, to be followed by 6 years for armed robbery.

For the reasons stated above, we affirm the defendant's conviction, vacate the defendant's sentence, and remand this case to the circuit court for resentencing.

Affirmed in part and vacated in part; cause remanded.

R. GORDON, P.J., and HALL, J., concur.

# REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT

THE PEOPLE OF THE STATE OF ILLINOIS,
     Plaintiff-Appellee,

v.

DEMETRIUS JOHNS,
     Defendant-Appellant.

### No. 1-06-1190

**Appellate Court of Illinois**
**First District, First Division**

**Filed: November 17, 2008**

### JUSTICE GARCIA delivered the opinion of the court.

**R. GORDON, P.J., and HALL, J., concur.**

**Appeal from the Circuit Court of Cook County**
**Honorable Reginald Baker, Judge Presiding**

| | |
|---|---|
| **For PLAINTIFF -** **APPELLEE** | **James E. Fitzgerald, Assistant State's Attorney, Of Counsel, Manuel Magence, Assistant State's Attorney, Of Counsel, Sari London, Assistant State's Attorney, Of Counsel** **RICHARD A. DEVINE** **State's Attorney of Cook County** **Richard J. Daley Center–Room 309** **Chicago, Illinois 60602** |
| **For DEFENDANT -** **APPELLANT** | **Tiffany Green, Assistant Public Defender** **MICHAEL J. PELLETIER, Deputy Defender** **Office of the State Appellate Defender** **203 N. LaSalle Street, 24th Floor** |

**Chicago, IL 60601**